Filed 1/12/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D071432 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS277981) |
| MANUEL SALDANA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Dwayne K. Moring, Judge. Reversed.

Charles M. Sevilla for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

This *Miranda*[1] case involves Manuel Saldana, a 58-year-old legal Mexican immigrant with a sixth grade education who, with no notable criminal history, was

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

charged with committing lewd acts on three girls, G.H. (age 11), M.H. (age 8), and Y.H. (age 6) (collectively the children), who live in the trailer park where he resides.

From the outset, the veracity of the children's claims was open to question. Left mostly unsupervised, the eight year old and the 11 year old watched a daily television soap opera which frequently depicts adult themes. After watching, the girls acted out episodes themselves. The day before accusing Saldana of molesting them, they watched an episode involving child molestation.

In a police station interrogation—with no *Miranda* advisements—Saldana confessed to inadvertently touching G.H. and M.H. on the vagina, outside their clothes. The jury watched a video of his confession and during deliberations asked to watch it again. About two hours later, the jury found Saldana guilty of four counts of committing lewd acts, violating Penal Code section 288, subdivision (a). The court sentenced Saldana to six years in prison.

Saldana raises numerous issues on appeal; however, the heart of this case is whether Saldana was subjected to a custodial interrogation—because if he was, the court erred in allowing the jury to hear Saldana's confession over his *Miranda* objection. Except for being captured red-handed, a confession is often the most incriminating and persuasive evidence of guilt—an "evidentiary bombshell" that frequently "shatters the defense." (*People v. Cahill* (1993) 5 Cal.4th 478, 497.)

In response to police request, Saldana voluntarily went to the station for questioning. He was not handcuffed and when questioning started the detective told Saldana he could leave when he wanted and would not be arrested—"right now."

2

However, once the detective closed the door and began interrogating Saldana, the interrogation was persistent, confrontational, and accusatory.

For about 40 minutes, the detective utilized classic interrogation techniques designed to convey two things. The first is the interrogator's rock-solid belief the suspect is guilty and all denials will fail. "'Such tactics include making an accusation, overriding objections, and citing evidence, real or manufactured, to shift the suspect's mental state from confident to hopeless.'" (See *In re Elias V.* (2015) 237 Cal.App.4th 568, 583 (*Elias V.*).) The second is to provide the suspect with moral justification and face-saving excuses for having committed the crime, a tactic that "'communicates by implication that leniency in punishment is forthcoming upon confession.'" (*Ibid.*)

Here, for example, the detective told Saldana, "It looks bad." "It looks very bad, Manuel." "I have information that that happened." "And part of what you're telling me, not only doesn't it coincide, but there are some things that don't coincide." "And what else, Manuel? What has happened in your house? That's what I want to know." "Look, Manuel, something happened." "Manuel? What did you do with them?" "What happened, Manuel?" "And I want to get to the truth. But right now, you're not telling me the whole truth." "Well, the truth, Manuel." "When her clothes come[] back from the laboratory, is it [*sic*] going to come back with your DNA?"

Saldana denied such accusations more than 25 times, this being typical: "No, nothing, sir. Nothing. I mean, I haven't touched them. I haven't done anything to them. I don't have a reason to do, to do it."

3

The detective told Saldana, "[S]ometimes we make mistakes.  Sometimes things happen."  And "[m]aybe . . . you went too far or something."  Later, the detective suggested it was "a moment of weakness or a moment that perhaps the girls put themselves there?  One sat next to you.  And at that moment, you didn't think correctly."  Again, Saldana denied these accusations stating, "No.  Trying to do something, no . . . . No, sir."

But ultimately, Saldana confessed, stating he inadvertently touched M.H. and G.H. twice on the vagina, over their clothes.  In response to the *prosecutor's* question, Saldana testified he believed he could not leave the police station unless he confessed:

> "[H]e asked me many times and he don't believe me I don't [*sic*] did it.  And I don't [*sic*] did it.  [¶] And I was thinking, if I say that, he will not let me go home."

The power of these interrogation techniques to extract a confession is keenly described in *Miranda*.  (*Miranda, supra,* 384 U.S. at pp. 445-455.)  Since *Miranda,* the United States Supreme Court has expressed concern that such interrogation "can induce a frighteningly high percentage of people to confess to crimes they never committed." (*Corley v. United States* (2009) 556 U.S. 303, 321.)  "Estimates of false confessions as the . . . cause of error in wrongful conviction cases range from 14 to 25 percent."  (*Elias V., supra,* 237 Cal.App.4th at p. 578.)

It is appropriate for police to use these interrogation techniques.  However, when police create an atmosphere equivalent to that of formal arrest by questioning a suspect who is isolated behind closed doors in a police station interrogation room, by repeatedly confronting him with the evidence against him, repeatedly dismissing his denials, and

4

telling him at the outset he is free to leave—when all the objective circumstances later are to the contrary—*Miranda* is triggered. The court prejudicially erred in receiving Saldana's confession into evidence. Accordingly, we reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Saldana, Martha, Angelica, and Their Families*

In 2015 Martha H. lived in a trailer park in National City, California, with her children D.H. (age 19), J.H. (age 21), and Erik (age 24).

Saldana legally entered the United States in 1980 and has five adult children. For the past 24 years he has worked installing drywall for the same employer. Saldana lives in a mobile home in the same park, and he and Martha have had a steady relationship for 14 years.

Angelica is Martha's sister-in-law, and for a period Angelica and her children also lived in the same trailer park. Angelica has five children, including G.H., M.H., and Y.H.

About eight years earlier, Angelica's husband moved to Tijuana. Subsequently, Angelica was evicted and she also moved to Tijuana. After Angelica's eviction, the children lived with Martha. The children missed their father. They seemed to need and seek a lot of attention.

B. *Telenovelas*

G.H. and M.H. spent a lot of time watching television, particularly telenovelas— Spanish language soap operas with adult themes such as drug use, child molestation, divorce, extramarital affairs, and sex. The shows depicted "a lot of mistreatment of families," including child molestation. G.H. and M.H. watched the telenovelas "pretty

5

much" every day, "as soon as they got home from school."  After watching, the girls acted out the episodes themselves.  D.H. explained:

"Q  Now, you said that they would act out the telenovelas?

"A  Yes.

"Q  In what way?

"A  They would say, 'Okay.  You're this character.  I'm this character.'  [¶] They will have their dolls and they carry them.  [¶] And they would, like, fight—like, play fighting between them.

"Q  So they would act out scenes of play fighting with their dolls?

"A  Yeah.  [¶] But they were—for example, once they were playing and then it was about one of them taking their husband away.

"Q  Okay.  So they were acting out like boyfriend/girlfriend—

"A  Yeah.

"Q  —mom and dad kinds of things?

"A  Yes."

The children had grown up at the trailer park and had known Saldana their entire lives.  They called him "Uncle."  Occasionally after school, they would go to Saldana's trailer to play and to eat.  Martha warned Saldana not to allow them there because the children were mischievous, would make a mess, and would grab whatever food they could find.

6

C. *The Reported Incidents*

On February 3, 2015, G.H. and M.H. were outside playing when D.H. "started to notice something weird." She asked the girls, "[W]hat's going on," and initially they said, "Oh, nothing." But later M.H. told D.H., "It's something about Tio [Uncle] Manuel."

D.H. replied, "Did you guys get in trouble? Did you guys break something? Did you guys—what did you guys do?" M.H. started crying and said Saldana had "touched her like—like her thigh" or leg. M.H. said it happened the day before, when she and G.H. were playing at Saldana's home. When D.H. asked M.H. if this had happened before, she said, "I don't know. I don't know."

D.H. asked G.H., "Do you know anything about this? Did it happen to you?" G.H. replied, "No, I don't know anything." Later G.H. told D.H. that the previous day she and M.H. had made a mess in Saldana's trailer by overflowing the toilet. G.H. told D.H., "I just don't want to get in trouble."

D.H. told Erik what M.H. reported. Erik telephoned Angelica at work and told her to come to Martha's trailer. When Angelica arrived, M.H. told her Saldana touched her leg and her "private parts" outside her clothes.[2] G.H. also said Saldana touched her legs and her "private parts" on top of her clothes. M.H. said that when Saldana touched them, he was on the sofa and used a pillow so that if he was touching M.H. it would not be seen by G.H. and vice-versa.

---

[2] At the time of trial, Angelica was deceased. Her preliminary hearing testimony was read to the jury.

7

Erik drove Angelica, G.H., and M.H. to the National City police station to make a report. There, Officer Gregory Gisi spoke to Angelica, but he did not interview G.H. or M.H. Angelica told Officer Gisi that Saldana had tried to touch G.H. on the leg, but G.H. would not let him. Angelica reported that M.H. had told her Saldana touched M.H.'s vaginal area, over her clothing. Angelica told Officer Gisi the girls could not say if the touching occurred inside or outside the house, and they reported Saldana had touched them three other times. Police gave G.H. and M.H. toys, and when the girls returned home they were "normal" and much happier.

On February 10, 2015, Nancy Quinteros, a protective services worker employed by the County of San Diego, interviewed G.H. and M.H. M.H. told her that Saldana "tried to touch her," and he had a pillow that he put over his hand "as he tried to touch her private parts." M.H. said this happened in Saldana's home and he had never done that before.

In a separate interview, G.H. told Quinteros that a pillow was involved and although Saldana tried to touch her, she did not let him; she got up and left. G.H. told Quinteros that Saldana tried more than five times to put his hands under her pants. G.H. said Saldana also tried to touch M.H. by putting a pillow on top of his hand and moving it over her leg; however, M.H. would get up and leave.

Two weeks later, Marisol Olguin, a forensic interview specialist, interviewed G.H. and M.H. G.H. told Olguin that Saldana put his hand "underneath the pants and then from there he would put it in the underwear." She said this happened about five times and his hand went underneath her underwear. G.H. said that M.H. told her Saldana had

8

touched her "the same as me." At the end of the interview, G.H. told Olguin that Saldana "[c]aress[ed]" her inside her clothes. M.H. told Olguin that Saldana touched her "private part" by putting his hand underneath a pillow and touching outside her clothes.

After observing these interviews, National City Police Detective Robert Gonzales went to Saldana's trailer. Saldana was not home, so the detective left a card asking Saldana to call him. A few days later, Saldana called and made arrangements to meet the detective at the police station.

D. *The Miranda Motion*

On March 10, 2015, Detective Gonzales questioned Saldana at the police station. The interrogation, conducted in Spanish, was video recorded. Police did not advise Saldana of his *Miranda* rights.

Before trial, Saldana's lawyer filed a motion seeking to exclude Saldana's confession as having been obtained in violation of *Miranda*. The People filed opposition, asserting no *Miranda* advisements were required because Saldana was not in custody when interrogated.

After watching the video of Saldana's interrogation, the court conducted a hearing. Saldana's lawyer noted that in the interrogation, Saldana said, "[W]hat is going to happen to me"—indicating he was not free to leave. Moreover, the detective told Saldana, "I didn't come down here just to hear a story by you"—Saldana's lawyer asserted this indicated Saldana was not free to leave until he admitted guilt. Counsel also asserted the detective told Saldana, "I don't believe you," and "you're not telling me the truth" and "you're not giving me all the information"—which was tantamount to saying he was

9

lying. This, Saldana's lawyer argued, showed "what's going on here is that the detective is accusing him repeatedly and is refusing to take no for an answer"—which indicates a custodial interrogation. Saldana's lawyer concluded his argument by stating, "[T]here's a very simple solution for this: The detective advises [Saldana] of his rights under *Miranda,* as they're [*sic*] required to do. . . ."

Disagreeing, the deputy district attorney noted that Saldana "comes on his own to the police station" and at the end of the interview "is allowed to leave the police station . . . and walk about a block away before he's actually arrested." Asserting the detective was "polite and courteous . . . not yelling," the prosecutor argued the interrogation was noncustodial and, therefore, *Miranda* did not apply.

The court denied Saldana's motion to exclude his confession. The court stated that although the interview room door was closed, the station was noisy and "some level of privacy is afforded by closing the door." Accordingly, the court determined that the closed door "doesn't mean specifically that [Saldana] can't leave." Moreover, the court noted Saldana was not handcuffed, and it was a one-on-one interview between Saldana and the detective. The court said the detective's demeanor was nonthreatening, and he did not "say outright" that Saldana was lying. Based on "the totality of the circumstances," the court denied Saldana's motion, determining "the interview was voluntary and noncustodial . . . ."[3]

---

3     Saldana's lawyer repeated his *Miranda* objection before the prosecutor played the interrogation for the jury, and again before the court received the video into evidence.

E.  *The Confession*

The jury watched the first 53 minutes of the video of Saldana's interrogation, with a contemporaneous English translation on screen.  The jury was also given a Spanish-English transcript to read while the video was playing.[4]

1.  "*You're not under arrest, okay?  You can leave when you want.*"

After obtaining some biographical information about Saldana, Detective Gonzales said, "Look, Manuel, . . . you're not under arrest, okay?  You can leave when you want.  I mean, I'm going to ask you some questions, but the door is open, the door we came through.  It's open.  You can leave when you want, okay."  After Saldana responded, "I agree," Detective Gonzales said, "Um, we're not going to arrest you right now.  That's why the front door is open to go out without—without us arresting you."

However, the door was actually closed, and it remained closed the entire interrogation.

2.  *Saldana's initial statement*

Detective Gonzales asked Saldana, "Do you more or less know why you're here?"  Saldana replied that after he came home from work one evening, M.H. and D.H. were playing nearby.  They call him "uncle" because he is their aunt's boyfriend.  As the girls often did in the past, they came into his trailer to play.  His door was open because it was

---

4      The video of the confession (exhibit 12) is entirely in Spanish.  The jury was also shown an English translation "on the screen" and was handed an English-Spanish transcript (exhibit 12A) while the video was playing.  Although exhibit 12A was not received in evidence, the parties have stipulated that for purposes of appeal, exhibit 12A is properly part of the record.

hot. The girls started a pillow fight with Saldana on the sofa. Then the girls went outside and came back in and started jumping on his bed. He told them to stop and go outside. They went out, but returned and started playing in the bathroom, causing the toilet to overflow. Saldana cleaned up the mess. The girls left and he did not hear from them for three or four days.

Saldana stated that the next day, he received a telephone call from a friend whose wife knows Martha. The friend told him the girls were accusing him of molesting them. Saldana went to Martha's house and denied it. J.H. told Saldana that M.H. "says that you had you[r] zipper down and you told her that you were going to put it in her butt . . . ."[5] After denying this, Saldana said, "I'm telling the truth," and "I'll be here. . . . I'm not going anywhere."

3. *Minimizing questioning*

After Saldana told Detective Gonzales he was "devastated" by the allegations, the detective told Saldana he "just want[ed] the truth" and said, "[S]ometimes we make mistakes. Sometimes things happen. . . . Um, but now is when the truth has to come out, tell me what really happened." The detective encouraged Saldana to confess, "[e]ven if it was something or it was a mistake . . . maybe well you went too far or something." Detective Gonzales encouraged Saldana to "get to the truth . . . . For your wellbeing, for the wellbeing of the girls, to be able to close this, okay?"

---

5    This accusation was not made in any of the children's statements to D.H., Angelica, child protective services, the forensic interviewer, or at trial.

4. *Accusatory questioning and Saldana's denials*

Next, Detective Gonzales stated he did not believe Saldana's denials. The detective said, "[R]ight now what I don't want is that you give me a story about this is what happened . . . ." Detective Gonzales said, "Do you understand? Um, that's what I want to know. What happened, Manuel? Because you telling me that nothing happened, honestly, like it doesn't—it isn't entering my head." "What's a 58-year-old man doing with two or three girls that age in his house?"

When Saldana replied, "I didn't take them to my house, sir"—the detective said, "You don't think that it—that it looks bad . . . that you have three girls in your house, that aren't your daughters. . . . It looks bad. . . . It looks very bad, Manuel. . . . [B]ecause I have information that that happened. Okay? And part of what you're telling me, not only doesn't it coincide, but there are some things that don't coincide. There is in—information from two people that are telling me, 'This is what happened'. Two separate people and the stories don't coincide with what you're telling me. Okay? And I don't know why someone is going to lie about this." The detective also said, "[W]hat else happened?" and "[Y]ou know that something else happened."

Saldana continued denying the accusations, stating, "Well, that I touched her inappropriately, inappropriately, no, sir." Detective Gonzales stated, "Did you try to touch them, Manuel?" Saldana replied, "No, sir." The accusations continued: *Detective*: "Did you try to touch them, Manuel?" *Saldana*: "No, sir." *Detective*: "Did you try touching them?" *Saldana*: "No, sir."

13

The detective persisted, stating: "And what has happened? That's what I want to know." "And what else, Manuel? What has happened in your house? That's what I want to know." "You're a 58 year-old man . . . with two girls . . . in your house that aren't your daughters. For reasons that I don't know why[,] you didn't take them home . . . ." "What happened Manuel?"

Again, Saldana denied touching the girls, stating, "No, nothing sir. Nothing. I mean I haven't touched them. I haven't done anything to them. I don't have a reason to do—to do it—to do it." The detective suggested Saldana was lying, and told him he would "feel better" by confessing:

> "Detective: I don't know why the girls are going to lie. . . . [¶] . . . [¶] Look, Manuel, something happened. And like I said, right now is when—like I'm telling you, right now is the time to say what happened. Okay? Right now is when. Right now is when you have to let it all out. If something happened, say it now, okay? . . .
>
> "Saldana: No.
>
> "Detective: Help yourself. You'll feel better. [¶] . . . [¶] Because sometimes it's hard to keep a secret inside."

But Saldana continued his denials, stating, "I don't." At this point, Detective Gonzales suggested matters would be worse for Saldana if he did not confess, stating, "And like I said, I don't want to find out later that—that something happened. And find evidence later, because if there is, I'm going to find it, that you did touch them or that you did something to them. Okay? [¶] . . . [¶] And finding them [*sic*], that evidence is going to be worse for you."

14

But still, Saldana continued to deny the charges: *Saldana*: "I haven't done anything to them, sir." *Detective*: "Or tried to." *Saldana*: "No." *Detective*: "Did you try, Manuel?" *Saldana*: "No . . . ." *Detective*: "Manuel? What did you do with them?" *Saldana*: "No." *Detective*: "How—how did you try to touch—touch the girls?" *Saldana*: "No, no. I never tried to touch them. I would just move them, like that."

Detective Gonzales again suggested Saldana was not being truthful. He told Saldana the children knew the difference between being pushed off during play and being "caress[ed]"—"[a]nd that's what these girls are telling me. That's what they felt. That it's a—a very ugly feeling for a person that they love and that they—feel close to do to them. Okay, Manuel. And that's what I want to know, Manuel."

Saldana said he was "embarrassed" if the girls were saying such things. The detective replied, "If you feel bad, it's because you did something." But again, Saldana said, "No."

5. *Minimizing*

At this point, Detective Gonzales offered a "false choice"—alternative explanations for improperly touching the girls—something that seems to be morally less offensive. (See *Elias V., supra,* 237 Cal.App.4th at p. 586.) He stated, "I'm telling you, if it was something minor that at that moment you said, 'I'll take advantage right now. No one is looking. The girl is here. The other one is occupied.' [¶] . . . [¶] I gave in, look, real quick here." But Saldana again unequivocally denied the accusations, stating, "No. No. [¶] . . . [¶] No, sir, no."

15

6. *More accusations—false evidence*

Brushing off Saldana's denials, Detective Gonzales continued. He told Saldana the girls said this was "not the first time that it has happened." Saldana replied, "No, no, no."

Detective Gonzales asked, "What happened?" He accused Saldana of lying: "I want to get to the truth. But right now, you're not telling me the whole truth. So you're giving me pieces. [¶] . . . [¶] You're giving me pieces and we want to get to the truth. And I want to know what happened." Once again, Saldana denied the allegations, stating, "No, sir, no."

The detective went back to the false choice: "You're a man. Tell me what you felt. [¶] . . . [¶] You felt something, excited, something." But Saldana again denied molesting the girls, stating, "No."

At this point, the detective asked another "What happened, Manuel?" question, to which Saldana again replied, "No, sir, well I like what I'm telling you. They were playing there with me and that, but well no—I didn't—inappro—inappropriately that I touched them like that, no. No, sir." The detective deflected the denial, stating, "You're not giving me all the information, Manuel." Again, another denial: "Well, no." The detective replied, "You're leaving out the—the—the most important thing that happened with them." Saldana again denied molesting the girls, stating, "I didn't touch them. Not like that, no. No. No, sir, no. No, not in any other form. In what other form? No. I didn't touch them in any other form, sir."

16

Detective Gonzales told Saldana the girls' clothing was being tested for DNA. But this was apparently a ruse; there was no DNA evidence.[6] Saldana continued to deny the accusations:

> "[Detective]: When her clothes come[] back from the laboratory, is it [*sic*] going to come back with your DNA?
>
> "Saldana: No, my DNA, no, sir. How am I going to . . . ?
>
> "[Detective]: I don't know. I'm telling you.
>
> "Saldana: No. No, no, sir.
>
> "[Detective]: You know that something happened, Manuel.
>
> "Saldana: I didn't touch them inappropriately.
>
> "[Detective]: You tried.
>
> "Saldana: God knows I didn't.
>
> "[Detective]: You tried.
>
> "Saldana: How—how—how can I tell you that . . . ? Hey, no, sir, no. I can't say something that I didn't do. I can't say that I touched them or that I touched them inappropriately . . . .
>
> "[Detective]: And why do you think two girls are accusing you that you did this? Two girls that—that you have known their entire life [*sic*] ? Two girls who are fond of you. Two girls that go to your house. . . . And all of a sudden they were with, 'My uncle did this to

---

6 "Studies demonstrate that the use of false evidence enhances the risk of false confessions. [Citation.] 'Confronting innocent people with false evidence—laboratory reports . . . —may cause them to disbelieve their own innocence or to confess falsely because they believe that police possess overwhelming evidence. Innocent suspects may succumb to despair and confess to escape the rigors of interrogation in the naive belief that later investigation will establish their innocence rather than seek to confirm their guilt.'" (*Elias V.*, *supra*, 237 Cal.App.4th at p. 584.)

17

us.'  Something is odd there. . . .  I'm saying if nothing happened, they don't have a reason to be saying it did."

7. *Less culpable scenario*

After Saldana again said, "No", Detective Gonzales suggested Saldana admit to a less morally revolting reason for molesting a child:  *Detective*:  "The only reason that they would say—say this is because something happened.  The thing is[,] Manuel, was it a moment of weakness or a moment that perhaps the girls put themselves there?  One sat next to you.  And at that moment, you didn't think correctly.  You weren't in—you weren't yourself and it seemed easy to you.  And what happened happened.  Or did you try to do something, but you couldn't?  Was that what happened?"

But again, Saldana denied touching the girls, saying, "No.  Trying to do something, no . . . .  No sir."  The detective said, "Well, you did something to them." *Saldana*:  "No, no.  No.  In fact, it's just how I told you.  They would sit there with me, but no."

The detective replied, "I know that you have it there on the tip of your tongue, Manuel[,] that you want to tell me something.  Like I said, now is when to tell the truth, get everything out now. . . .  That you touched them."  Saldana said, "No. . . .  I never tried to—to inappropriately touch them, sir."

8. *Confession*

Detective Gonzales said, "[W]e're here for—for—for one reason," and "[b]oth girls were interviewed.  This was what came out," and there was no reason for the girls to "make up stories about something happening."  Here, about 38 minutes into the

18

interrogation, Saldana said, "No well I don't know. . . . I'm very embarrassed and everything and I don't know what to do."

Detective Gonzales said, "Something happened. That's why you're here with me." Saldana replied that he "touched them" when the girls "sit there on my hand" but it "wasn't my intention to do it." Saldana stated he touched the vagina area "like twice or three times." The touching was over the clothes. It happened "spontaneously" while they were playing on the sofa.

Detective Gonzales asked Saldana if he wanted to "write a forgiveness letter" because "people sometimes feel better, it helps them if they write a forgiveness letter." Translated into English, Saldana wrote:

> "To [G.H. and M.H.]. I ask forgiveness for the things that I did to you. I ask you in the way or please forgive me. I do not know why I did this. I feel so ashamed. I ask all your family for forgiveness. I am very sorry. Sorry. Thanks."

Detective Gonzales asked Saldana if he felt "pleasure" when touching the girls. Saldana said, "No." When the detective said, "You just . . . wanted to touch them," Saldana replied, "No, well, I don't know. The devil got in me, but no. No other thing. No other intentions." The detective walked Saldana out of the station house. Police arrested Saldana minutes later, about a block away.

F. *G.H.'s Trial Testimony*

G.H. was 11 years old at the time of trial. She testified that Saldana put his hand under her underpants more than once. She did not report the molestation earlier because she was "ashamed."

19

G. *M.H.'s Trial Testimony*

M.H. was nine years old at the time of trial. She testified it was "too hard" for her to say what Saldana did that made her feel uncomfortable.

H. *Y.H.*

After police arrested Saldana, Y.H. (age 6) told her sisters (G.H. and M.H.) that Saldana had molested her too. But at trial, Y.H. could not remember any touching. At Saldana's preliminary hearing, Y.H. testified Saldana put his hand on her "stomach" *over* her shirt, *above* the bellybutton. Yet, in a forensic interview, she said Saldana "grabbed" her "on the vagina" and "underneath" her shorts.

I. *The Defense Case*

1. *Suggestibility expert*

Bradley McAuliff, a psychologist with expertise in witness suggestibility, testified that suggestibility involves how memory is compromised. Factors influencing memory include age, maternal attachment, the effects of repeated questions from adult authority figures, and cross-contamination. McAuliff testified that as age increases, suggestibility decreases.

He testified that maternal attachment looks at the relationship between the child and mother. Insecure attachments "make kids more vulnerable to suggestion." If the child has an unstable maternal attachment and fears abandonment, the resulting "anxiety because the parent hasn't been present . . . could increase suggestibility."

Repeated questioning by adults can also cause suggestibility. McAuliff explained:

"The other tricky thing about repeated questions with kids is, if you ask children a question enough times and they answer it and you keep asking that question, there's research that shows that kids can reverse their answer because they assume that the adult is not satisfied. You know, the adult—I've answered this question. The adult keeps asking it. Maybe I didn't give the right answer.

"So you can get shifts in responses as a function of this question repetition."

McAuliff testified that cross-contamination can happen when witnesses talk with each other or overhear conversations:

"So in cases where there are, for example, several siblings, a lot of times those kids are questioned in front of one another or within earshot of each other and that information can contaminate their recollections."

McAuliff testified that the children's forensic interviews were "premiere" and "good." However, he stated that even good later questioning will not undo the effects of prior improper questioning or contamination that had already occurred. According to McAuliff, children in an unstable environment, unsupervised, needing attention, questioned by authority figures, who received positive reinforcement for reporting molestation and who were questioned by authority figures, are vulnerable to reporting things "that simply didn't happen."

2. *Psychosexual evaluation*

Bruce Yanofsky has a doctorate degree in clinical psychology. He is fluent in Spanish and for the last 12 years has worked for the State of California conducting

21

sexually violent predator evaluations. In 99 percent of those cases, Yanofsky testifies for the prosecution.

Yanofsky conducted a psychosexual evaluation of Saldana to determine if Saldana presented a characteristic profile of someone who commits sex crimes against children.[7] In addition to reviewing the police and forensic interview reports and the video of Saldana's police interrogation, Yanofsky conducted a clinical interview of Saldana, which means" that [he] talked to him for probably two to three hours about his life, his origins, his entire history." Yanofsky also administered to Saldana a "sexual interest instrument"—the Abel Assessment of Sexual Interest (Abel). In the clinical interview, Saldana did not describe any abnormal or unusual behaviors such as problems in school or witnessing sexual activity or images of anything of the like when growing up. Nor was Saldana exposed to sexual matters or sexual abuse when growing up.

Yanofsky testified the onset of sexual interest in children usually begins either in adolescence or early adulthood into the 30's and maybe 40's. It is "somewhat unusual" to find individuals who start having sexual interest in children later in life.

Yanofsky administered the Abel test because it "objectively tr[ies] to evaluate if there is or is not a sexual interest in children." The Abel test is peer-reviewed and "very well-accepted" in the psychological community. Although it is possible for someone to

---

[7] In *People v. Stoll* (1989) 49 Cal.3d 1136, the California Supreme Court held that a defendant charged with child molestation has the right to introduce expert testimony from a psychologist who evaluated him and determined that the defendant's character is not consistent with that of a typical child molester. (*Id.* at pp. 1152–1161.)

"fake" responses, the Abel test contains safeguards to prevent that, and, if a subject should try to fake responses, the examiner "should pick it up quickly."

The Abel test measures sexual interest—what a person finds sexually arousing or attractive. Yanofsky testified that Saldana's test results showed Saldana is "an individual who is exclusively interested in females that are postpubescent." Saldana's results "are what we would consider to be perfectly normal for a heterosexual, adult male."

Later, Yanofsky again interviewed Saldana and administered a "Personality Assessment Inventory" (PAI). This test is designed to reveal abnormal psychology or mental illness, and assesses a person's personality structure. Saldana's PAI results showed him as a person who "passive in his relationship with others in the world. He is someone who follows rules, who does not have any type of antisocial or criminal approach or intent." Saldana also has no drug or alcohol problem.

Yanofsky testified that Saldana's PAI result "is very clear in basically stating that there's no characteristics that would match that of typical offenders. [¶] And not only that, it gives us a picture of a very passive, very warm individual that in some ways would be almost opposite to what you would expect from someone hurting or harming either children or anyone else." Yanofsky spent about eight hours with Saldana, and found him to be "very candid in terms of presenting his personal information."

In sum, Yanofsky testified his clinical interviews and testing showed no evidence that Saldana has any sexual interest in young children:

> "Q Did you find any evidence that [Saldana] has any sexual interest
> in young children?

23

"A  No, none whatsoever.

"Q  Did you find any evidence that [Saldana] had an abnormal or unnatural interest in children in any way, shape or form?

"A  No.

"Q  Based on your discussions with him and test results, did you—did you observe anything about his interests or anything else that falls outside the range of normal behavior?

"A  No."

On cross-examination, Yanofsky conceded there is "no way" he can determine whether Saldana never molested a child—but he added, "I can tell you that the probability is very low."[8]

3. *Saldana's testimony*

Outside the jury's presence, Saldana's lawyer stated he was making a "tactical" decision to have Saldana testify "because of the fact that the Court denied the *Miranda* motion and [Saldana's] statement[s] came in, I feel, that—I need to call [Saldana] to explain [his] statement[s]."

Saldana testified that the last time G.H. and M.H. were in his mobile home, he was sitting on the couch when the children grabbed pillows and started a pillow fight. He had to move the children off him several times, and while pushing them, he may have

---

8    Yanofsky acknowledged that on the part of the Abel test designed to measure the unwillingness to admit common violations of social mores (such as impatience and anger), Saldana scored 90, which is within a range that may indicate an inability to respond truthfully to others. However, Yanofsky said that no single score on the battery of tests is "going to be the end-all or tell-all of the case." Rather, "[y]ou have to look at the—the whole picture rather than an individual piece."

accidentally touched them on the vagina. The girls then went to his bathroom, which they flooded.

Saldana testified he felt "ashamed" because he was being accused "for something I don't [*sic*] did." He testified that he told the detective he touched them on the vagina "[b]ecause he was asking me '[w]hich part did you—did you touch? Which private part did you touch?' [¶] And I told him many times, 'I don't—I don't touch any private parts.' [¶] And—and then that's when I told him the vagina because he don't believe me."

Saldana testified he wrote the apology letter "because the officer asked me to write a letter" and "I was thinking I'm going to give it to them." He felt "bad about the accusation" and "[t]hat's why I asked them to forgive me." Saldana testified that when he said "the devil got in me" he was trying to say he did not do any touching for pleasure:

> "Q You told the detective you felt horrible. Why did you say that?
>
> "A Because he was asking me, 'How are you—how you feel? How you feel?' I said, 'I feel horrible. Horrible.'
>
> "Q Why didn't [*sic*] you feel horrible?
>
> "A Because accused—I got.
>
> "Q The detective asked you what were your intentions. You said, 'No. It wasn't no other intentions. Honestly, I didn't. No. Well, I don't know. The devil got in me. But no—no other thing. No other intentions.' [¶] What did you mean by that?
>
> "A Well, he asked me if I did it for pleasure or if I feel something. And I said, 'No, I don't did it for pleasure.' [¶] That's why I say the

25

diabolo got on me.  Because I don't know what to—what—what I can tell him to believe me.  I don't know what else."[9]

J. *Rebuttal*

In rebuttal, the prosecutor called Deborah Davies, a forensic interviewer of abused children.  Davies testified that children may delay reporting abuse when the alleged perpetrator is a parent figure because the child may fear the possibility of losing that relationship.  She also testified that when children make the decision to tell an adult about abuse, they often only tell a small part of what their experience has been—like dipping a toe in the water—to see how it is received.  If the child is supported and believed, "typically or often they will continue with their disclosure process."

K. *Verdict*

After about one and a half days of deliberations, the jury returned guilty verdicts against Saldana on four counts of committing a lewd act against a child, two on G.H., and two on M.H.  On the prosecutor's motion, the court dismissed count 5—the count involving Y.H.—after the jury hung 9 to 3 for acquittal.

L. *Motion for New Trial and Sentencing*

Postverdict, Saldana's attorneys filed a motion for new trial, asserting several instances of jury misconduct.

---

[9]     Several witnesses also testified to Saldana's good character and lack of sexual interest in children.  Notably among them is Erik, who drove G.H. and M.H. to the police station—but testified he did not think Saldana had a sexual interest in children and he has "a doubt" in his mind "about whether what the girls are saying is true."  Martha testified Saldana has been her boyfriend for the past 14 years, she never saw Saldana act inappropriately around any children, and, in her opinion, Saldana does not have a sexual interest in children.

First, during deliberations a juror posted a Twitter message online stating, "I think I'm in love with the prosecuting attorney for this case that I'm on." That afternoon, the jury returned its guilty verdicts. Saldana's lawyer asserted, "This juror had an actual bias. No one could reasonably expect to be impartially judged by a person who expressed this bias for the prosecutor in a public forum while the juror was deliberating."

Second, during deliberations, Juror No. 1, a kindergarten teacher, said that in her experience, children delay disclosing abuse. During jury selection, Juror No. 1 was overheard talking to a prospective juror who said that children "lie all the time." Juror No. 1 disagreed with this prospective juror and stated that children don't lie. Saldana's new trial motion argued, "This was devastating to the defense, because it bolstered the credibility of the complaining witnesses and introduced inadmissible expert opinion into the deliberations."

Third, during deliberations Juror No. 5 told the other jurors that he had training in interrogation with the Navy Seals, that he was interrogated in Fallujah in a "black box," and, in his experience, the detective "went easy" on Saldana during his interrogation. Saldana's lawyer asserted this juror provided "expert opinion" in deliberations to "vouch for his opinions that the pressure exerted on [Saldana] by the detective was not the kind that would lead him to make false statements."

Fourth, Juror No. 9 was a prison guard. During deliberations, he told the jury he worked with "high risk sex offenders" in prison. He told the jury that in his experience, these inmates may commit sex acts in custody even when they did not have a history of such conduct. Saldana's attorney argued, "[T]his juror touted his expertise in managing

27

high risk sex offenders . . . to undermine [Saldana's] *Stoll* expert testimony and character defense."

Fifth, Saldana asserted that Juror No. 5 did not reside in San Diego County and was, therefore, not qualified to serve as a juror.

After conducting a hearing, the court denied Saldana's new trial motion and sentenced him to prison.

DISCUSSION

I. *THE COURT ERRONEOUSLY OVERRULED SALDANA'S* MIRANDA *OBJECTION*

A. *Standard of Review*

In *Miranda*, *supra,* 384 U.S. 436, the United States Supreme Court held that a person questioned by law enforcement after being "taken into custody" must first be warned that he or she has the right to remain silent, that any statements he or she makes may be used against the person, and that he or she has a right to the presence of an attorney, either retained or appointed. (*Id*. at p. 444.) If police take a suspect into custody and then interrogate the person without informing of such rights, the person's responses cannot be introduced into evidence to establish his or her guilt. (*Berkemer v. McCarty* (1984) 468 U.S. 420, 429.)

The obligation to administer *Miranda* warnings attaches only when the person questioned is in "'custody.'" (*Stansbury v. California* (1994) 511 U.S. 318, 322 (*Stansbury*).) In *Miranda* jurisprudence, custody is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508-509 (*Howes*).)

28

On appeal, "we accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was 'custodial.'" (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 (*Aguilera*).)

B. *Custody Factors*

*Miranda*'s primary concern is the "psychological pressures 'which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely,'" which are created by "'incommunicado interrogation'" in an unfamiliar "'police-dominated atmosphere.'" (*Maryland v. Shatzer* (2010) 559 U.S. 98, 103.) The *Miranda* court reasoned that "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." (*Miranda, supra,* 384 U.S. at p. 458.)

In determining whether a person is in custody for purposes of applying *Miranda*, the issue is whether, in light of the "'objective circumstances of the interrogation,' [citation], 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" (*Howes*, *supra*, 565 U.S. at p. 509.) "And in order to determine how a suspect would have 'gauge[d]' his 'freedom of movement,' courts must examine 'all of the circumstances surrounding the interrogation.'" (*Ibid.*)

Courts have identified factors that are relevant in determining whether the defendant was in custody during police questioning. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive

29

atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest."   (*Ibid.*)  The relevant factors include:

> "[(1)] whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview;
>
> "[(2)] whether the express purpose of the interview was to question the person as a witness or a suspect;
>
> "[(3)] where the interview took place;
>
> "[(4)] whether police informed the person that he or she was under arrest or in custody;
>
> "[(5)] whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom;
>
> "[(6)] whether there were restrictions on the person's freedom of movement during the interview;
>
> "[(7)] how long the interrogation lasted;
>
> "[(8)] how many police officers participated;
>
> "[(9)] whether they dominated and controlled the course of the interrogation;
>
> "[(10)] whether they manifested a belief that the person was culpable and they had evidence to prove it;
>
> "[(11)] whether the police were aggressive, confrontational, and/or accusatory;
>
> "[(12)] whether the police used interrogation techniques to pressure the suspect; and
>
> "[(13)] whether the person was arrested at the end of the interrogation."  (*Ibid*.)

C. *Analysis*

1. *Voluntary interview*

Saldana voluntarily agreed to be questioned; he walked to the police station by himself. However, even where a suspect voluntarily goes to a police station for an interview, if "once there, the circumstances become such that a reasonable person would not feel free to leave, the interrogation can become custodial." (*United States v. Kim* (9th Cir. 2002) 292 F.3d 969, 975 (*Kim*).) Thus, Saldana's voluntary contact with the police is only the beginning of the inquiry.

2. *Express purpose*

The express purpose of the interview was to question Saldana as a suspect. When police interrogated Saldana (March 10, 2015), the children had already been interviewed several times, including by a professional forensic interviewer. There were no other witnesses. Given the tenor and manner of the detective's interrogation, the sole purpose of the questioning was to obtain a confession.

3. *Location*

The interrogation occurred behind a closed door in the interrogation room of the National City police station. *Miranda* warnings are not required "'simply because the questioning takes place in the station house . . . .'" (*People v. Moore* (2011) 51 Cal.4th 386, 402 (*Moore*).) However, *Miranda* emphasized that "the 'principal psychological factor contributing to a successful interrogation is privacy'" (*Miranda, supra,* 384 U.S. at p. 449, italics omitted) and for that police purpose, the interrogation should occur "'in the investigator's office or at least in a room of his own choice.'" (*Ibid*.) A subject should

31

not be interrogated in his own home, the police interrogation manuals say, because there the subject is more likely to be "'confident, indignant, or recalcitrant'" (*ibid.*) and "'more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support.'" (*Id*. at pp. 449-450.) At the police station, "'the investigator possesses all the advantages.'" (*Id*. at p. 450.)

Detective Gonzales knew where Saldana lived, and he left a business card there asking Saldana to call him. He could have spoken with Saldana at his home, but instead had Saldana come to the station. This factor will be more fully considered in connection with the nature of the police questioning.

4. *Whether police informed the person he was under arrest or was free to leave.*

At the outset, Detective Gonzales told Saldana, "[Y]ou're not under arrest," and "You can leave when you want." Saldana acknowledged this and even said, "I agree." However, after telling Saldana he was free to leave, the detective said, "Um, we're not going to arrest you right now"—suggesting that Saldana might well be arrested later.

Telling Saldana he was not under arrest and was free to leave indicates the beginning of the interrogation was not custodial. Even with the somewhat ominous—you will not be arrested "right now"—a reasonable person would have felt free to walk right out the door.

However, Saldana's confession occurs about 30 minutes later. By then, the circumstances had significantly changed. No longer were police asking Saldana biographical or open-ended questions to hear his version of what happened. To the

32

contrary, long before Saldana confessed, the detective asked an unrelenting number of accusatory questions such as: "What happened, Manuel? Because you telling me that nothing happened, honestly, like it doesn't—it isn't entering my head." "It looks very bad, Manuel." "I have information that that happened. Okay?" "And I don't know why someone is going to lie about this." "But what else happened." "And what else, Manuel? What has happened in your house? That's what I want to know." "Look, Manuel, something happened. And like I said, right now is when—like I'm telling you, right now is the time to say what happened." "Manuel? What did you do with them?" "If you feel bad, it's because you did something." "[T]hey said that it's not the first time that it has happened before."

Saldana denied all these accusations, saying, "Well, that I touched her inappropriately, inappropriately, no, sir", "No, nothing sir. Nothing. I mean, I haven't touched them. I haven't done anything to them." When the detective said, "[T]hey said that it's not the first time that it has happened before," Saldana replied, "No, no, no." But the detective would not take no for an answer:

"[Detective]: You know that something happened, Manuel."

"[Saldana]: I didn't touch them inappropriately.

"[Detective]: You tried.

"[Saldana]: God knows I didn't."

"The mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial per se." (*United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1088, italics omitted.) "We must consider the

33

delivery of these statements within the context of the scene as a whole." (*Ibid.*)  This is because the *Miranda* test for custody "does not ask whether the suspect was told that he was free to leave; the test asks whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" (*Ibid.*, italics omitted.)

Where, as here, police indicate to the defendant their resolute belief he committed the crime, the custody inquiry becomes whether a reasonable person in the defendant's situation—i.e., having been told by the police that they know he committed the crime—would think he was free to break off the interview and leave.  As Professor Wayne LaFave has pointed out in his treatise, *Criminal Procedure*, when a suspect has been told by the police that he is not under arrest and can leave at any time, but the contemporaneous conduct of the police nullifies that advice, the advice "will not carry the day."  (2 LaFave et al., Criminal Procedure (4th ed. 2015) § 6.6(d), p. 820, fn. 64.)  Courts have concluded that, under the circumstances of the particular case, advising the suspect that he was not under arrest and was free to leave was insufficient to support a conclusion that he was not in custody for purposes of *Miranda*.  (See, e.g., *United States v. Hashime* (4th Cir. 2013) 734 F.3d 278, 284 [telling the individual being interrogated he is free to leave "'is not "talismanic" or sufficient in and of itself to show a lack of custody'"]; *United States v. Cavazos* (5th Cir. 2012) 668 F.3d 190, 195 (*Cavazos*) [same].)

Here, in light of the detective's repeated rejection of Saldana's denials, a reasonable person in Saldana's position eventually would have realized that telling the "truth" meant admitting the detective's information was correct—and that until this

"truth" came out, the person could not leave. (*Aguilera, supra,* 51 Cal.App.4th at p. 1163.) "'The awareness of the person being questioned by an officer that . . . the police have ample cause to arrest him, may well lead him to conclude, as a reasonable person, that he is not free to leave, and that he has been significantly deprived of his freedom.'" (*Cavazos, supra,* 668 F.3d at pp. 194-195, italics omitted.) Although the custody determination is based on objective factors, it is noteworthy that Saldana's testimony is entirely consistent with this objective reality. On cross-examination, Saldana testified he did not feel free to leave unless he confessed:

> "Q You said, 'Well, I touched them like this on their part' and Detective Gonzales said, 'What part?' [¶] Correct?"
>
> "A Yes.
>
> "Q He didn't say what private part. He said 'What part,' right?
>
> "A Well, I don't remember exactly how he say. But—what part he say, which—which part. [¶] *And I realized, when I heard that— because he asked me many times and he don't believe me I don't* [*sic*] *did it. And I don't* [*sic*] *did it.* [¶] *And I was thinking, if I say that, he will not let me go home*." (Italics added.)

5. *Physical restraints, duration, number of officers*

Saldana was not handcuffed and only Detective Gonzales interrogated him. These two factors weigh in favor of finding Saldana was not in custody. The duration of Saldana's interrogation—less than an hour—is less important than the character of quality of the interrogation, considered next.

35

6. *Nature of interrogation*

The remaining factors involve the nature of the interrogation: Whether police (1) dominated and controlled the interrogation; (2) manifested a belief Saldana was culpable and they had evidence to prove it; (3) were aggressive, confrontational, and accusatory; (4) used interrogation techniques to pressure Saldana; and (5) arrested him at the end of the interrogation. (*Aguilera, supra,* 51 Cal.App.4th at p. 1162.) All these weigh strongly in favor of a determination that Saldana was in custody.

"'Accusatory questioning is more likely to communicate to a reasonable person in the position of the suspect, that he is not free to leave' than would general and neutral investigative questions. Thus, on the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory." (*Aguilera*, *supra,* 51 Cal.App.4th at p. 1164.)

Here, Saldana's interrogation was persistent, confrontational, and accusatory. Detective Gonzales did much more than simply confront Saldana with adverse evidence. He confronted Saldana with unqualified assertions of his guilt, despite Saldana's repeated denials. Presenting an unwinnable dilemma, the detective persisted in telling Saldana he should identify himself as either a pedophile ("What's a 58-year-old man doing with two or three girls that age in his house?") or an opportunistic molester ("I'm telling you, if it was something minor that at that moment you said, 'I'll take advantage right now. No one is looking. The girl is here. The other one is occupied.'") "[W]as it a moment of weakness or a moment that perhaps the girls put themselves there?"

36

Detective Gonzales repeatedly insisted he knew "something happened" and he could not imagine why the girls would "lie about this." At the same time, the detective insisted Saldana was not being truthful: "[R]ight now what I don't want is you give me a story . . . ." and "[Y]ou telling me that nothing happened, honestly, like it doesn't—it isn't entering my head." "I have information that that happened. Okay? And part of what you're telling me, not only doesn't it coincide, but there are some things that don't coincide." "Okay, what happened, Manuel. . . . [R]ight now, you're not telling me the whole truth." "You're not giving me all the information, Manuel. . . . You're leaving out the . . . most important thing that happened with them." "Well, the truth, Manuel." (See *United States v. Beraun-Panez* (9th Cir. 1987) 812 F.2d 578, 579 [finding custodial interrogation, in part because the officers demanded to know why the defendant was lying and said they knew the truth].)

Detective Gonzales's insistence that Saldana was guilty, his disbelief of Saldana's many denials, and his use of classic interrogation techniques reflects the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract. (*Elias V., supra,* 237 Cal.App.4th at pp. 579-581.) Detective Gonzales subjected Saldana to a classic two-pronged interrogation. First, involving tactics that suggested Saldana should confess because no other course of action is plausible, such as confronting him with real or invented evidence, identifying contradictions in his account, and refusing to credit his denials. And second, tactics suggesting Saldana will in some way feel better or benefit if he confesses, such as appealing to less morally culpable reasons for committing the offense.

Over and over again, Detective Gonzales conveyed the message that Saldana had no meaningful choice but to admit to some version of the crime because continued denials—in light of the extensive and irrefutable evidence against him—was simply futile. Insisting on the "truth" until Saldana told him what he sought, the objective message conveyed was that Saldana would be interrogated until he admitted touching the girls.

These tactics are not unusual, nor are they unreasonable. In fact, if Saldana had been properly *Mirandized* and made the same confession, it might be called good police work. But such an interrogation is associated with "the full-blown interrogation of an arrestee, and except for a *Miranda* advisement, we cannot conceive how [Saldana's] interrogation might have differed had he been under arrest." (*Aguilera, supra,* 51 Cal.App.4th at p. 1165.)

Although Detective Gonzales maintained a professional demeanor throughout—a pleasant and conversational tone of voice does not negate the inherently coercive nature of this interrogation in the absence of *Miranda* warnings. (See *People v. Lopez* (1985) 163 Cal.App.3d 602, 608, fn. 4 ["Accusatory questioning is more likely to communicate to a reasonable person in the position of the suspect[] that he is not free to leave."].)

7. *Arrest*

After Saldana confessed, police arrested him just a few minutes later, about a block from the police station. This was done apparently so Detective Gonzales could keep his word that he would not arrest Saldana on the spot. The trial court recognized

this was "more of a ruse than an actual statement of honest intent." We agree with that assessment. Applying *Miranda* cannot turn on pretenses like this.

8. *Custody conclusion*

Taking into consideration all the factors, we hold that well before Saldana's confession, a reasonable person in his circumstances would not have felt free to leave. Thus, Saldana was in custody during the interrogation and his confession was inadmissible.

Citing *Moore, supra,* 51 Cal.4th at pages 402-403, the Attorney General disagrees, asserting that "police expressions of suspicion, with no other evidence of restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." However, *Moore* is not on point because the interrogation there was vastly different from Saldana's.

In *Moore,* a police officer asked the defendant, who was the last person to see the victim alive, to give a witness statement at the police station. (*Moore, supra,* 51 Cal.4th at p. 396.) Once in the police station interview room, a police investigator told the defendant he was not under arrest and was free to leave. (*Id*. at p. 402.) The defendant was not restrained, and he was interviewed for one hour and 45 minutes. (*Ibid*.) The questioning initially focused on filling in the details of the defendant's story as a witness rather than as a suspect, but "[a]fter a while . . . , the detectives interjected some more accusatory and skeptical questions." (*Ibid*.) The investigators asked the defendant whether he burglarized the victim's house, they urged the defendant to be honest, and they asked various questions about the defendant's prior arrests and other matters that

39

"conveyed their suspicion of [the] defendant's possible involvement." (*Ibid*.) The police ultimately declined the defendant's request to be taken home and read the defendant *Miranda* advisements. (*Moore,* at pp. 401–402.)

The California Supreme Court concluded the defendant in *Moore* was not in custody during the bulk of the interview, reasoning, "At least until [the] defendant first asked to be taken home and his request was not granted, a reasonable person in [the] defendant's circumstances would have believed, despite indications of police skepticism, that he was not under arrest and was free to terminate the interview and leave if he chose to do so." (*Moore*, *supra*, 51 Cal.4th at p. 403.) Significantly, in making this determination, the court stated the interview was "not . . . particularly intense or confrontational." (*Id.* at p. 402.) "For a substantial period, while [the] defendant filled in his previous statements with details, the questioning did not convey any suspicion of defendant or skepticism about his statements." (*Id.* at p. 402.)

In *Moore,* "police consistently conveyed to [the] defendant that they wanted to question him only as a witness; [the] defendant sought and received the assurance that he was being asked only to give a statement of what he had seen and heard that day." (*Moore, supra,* 51 Cal.4th at p. 403.) In sharp contrast here, nearly all of Saldana's interrogation was pointed and accusatory. From the outset, police treated Saldana as guilty, confronted him with evidence of his guilt, and expressed not mere skepticism, but outright disbelief of his denials.

The Attorney General also contends the interrogation was not custodial because although the interview room door was closed, it was "figuratively open, meaning

40

[Saldana] could leave." We disagree. Custody is determined by objective criteria. (*Stansbury, supra,* 511 U.S. at p. 324.) As explained *ante,* the accusatory nature of the questioning here objectively conveyed that Saldana was not free to leave.

The Attorney General also contends that although the detective said he did not believe Saldana was telling the truth, "the detective never explicitly accused [Saldana] of lying." This is a distinction without a difference. Detective Gonzales repeatedly told Saldana he did not believe his denials and that Saldana was not telling the truth. Such techniques are designed to "'shift the suspect's mental state from confident to hopeless'" to encourage the suspect "to think that the only way to lessen or escape punishment is compliance with the interrogator's demand for confession, especially when minimization is used on suspects who are also led to believe that their continued denial is futile and prosecution inevitable." (*Elias V., supra,* 237 Cal.App.4th at p. 583.)

The Attorney General also asserts the interrogation was not custodial because the detective "did not suggest facts or scenarios which could have added to the coercive nature of an interview." The record is to the contrary. Detective Gonzales repeatedly stated he believed the girls' accusations and suggested several different scenarios that involved less morally or socially revolting reasons for molesting a child.

We also disagree with the Attorney General's assertion that it is significant the interrogation was conducted by only one officer and lasted less than an hour. The case law provides no bright-line rules regarding how long an interrogation must proceed before its duration is more consistent with custody than not. Except in an otherwise close case where duration might serve as a tipping point, the more significant factor is the

41

nature of the questioning, the character and quality of the interaction between law enforcement and the person being interrogated. In any event, courts have found an interrogation lasting approximately one hour to be suggestive of custodial circumstances. (*Kim, supra,* 292 F.3d at p. 977.) Moreover, under the totality of the circumstances here, well before Saldana confessed, no reasonable person would have thought he or she could just get up and walk out of the closed-door interrogation room. That Detective Gonzales was able to create such a coercive environment by himself does not negate the necessity of giving the required *Miranda* advisements.

D. *The Error Was Prejudicial*

"We review *Miranda* error under the 'harmless beyond a reasonable doubt' standard propounded in *Chapman v. California* (1967) 386 U.S. 18, 24." (*Aguilera, supra,* 51 Cal.App.4th at p. 1166.)

"A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.) The erroneous admission of Saldana's confession was prejudicial. Tellingly, the Attorney General's brief contains no harmless error argument, implicitly conceding the significant impact of Saldana's confession in this case. Saldana's confession was likely decisive in this case because (1) there were no independent witnesses, (2) the alleged victims may fairly be described as less than reliable, and (3) there was credible expert testimony favoring Saldana. Moreover, in closing argument, the prosecutor hammered the jury with Saldana's confession, stating "suggestibility is not an issue" because Saldana "told Detective Gonzales [']I touched

42

them down there.[']  He said he touched their vagina[s]."  The prosecutor read portions of Saldana's confession to the jury and concluded her argument by stating, "The girls say it happened that way.  He says it happened that way.  That's what happened beyond a reasonable doubt."

Moreover, during deliberations, the jury asked to watch the videotaped confession again.  "Juror questions and requests to have testimony reread are indications the deliberations were close."  (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295.)  About two hours later, the jury returned guilty verdicts, indicating the confession influenced the result.  (See *People v. Williams* (1976) 16 Cal.3d 663, 669 (superseded by statute on other grounds) [during deliberations, jury asks to hear confession again and "soon thereafter the guilty verdict was returned"—held, prejudicial].)  The error was prejudicial.[10]

## DISPOSITION

The judgment is reversed.

---

[10]    Accordingly, it is unnecessary for us to consider whether the court erroneously denied Saldana's motion for new trial or committed other errors asserted in Saldana's opening brief.

NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.