Filed 10/16/25; Certified for Publication & Modified 11/17/25 (order attached; see dissent)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAVIER NAVAADAME,<br><br>    Defendant and Appellant. | G064663<br><br>(Super. Ct. No. FVI17002285)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of San Bernardino County, Shannon Faherty, Judge. Reversed.

        Law Offices of Beles & Beles, Robert J. Beles and Michael D. Giesen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Namita Patel, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Decades ago, faced with situations involving incommunicado interrogation of individuals in a police-dominated atmosphere, the United States Supreme Court found in-custody interrogations of persons suspected or accused of a crime contain inherently compelling pressures which work to undermine a person's will to resist and compel them to speak though they would not otherwise do so freely. (*Miranda v. Arizona* (1966) 384 U.S. 436, 467 (*Miranda*).) Concerned with protecting the constitutional privilege against self-incrimination in light of such pressures, the high court concluded a person in such a situation "must be adequately and effectively apprised of [their] rights [related to that privilege] and the exercise of [such] rights must be fully honored." (*Ibid.*)

Defendant Javier NavaAdame appeals after being convicted and sentenced to over 120 years to life in prison for sexually abusing two children he and his wife adopted through the foster care system. He contends, inter alia, the trial court erred in admitting into evidence statements he made to law enforcement before he was formally arrested because they were the product of a custodial interrogation during which he was not advised of his *Miranda* rights.

We conclude the record before us presents a situation in which an interrogation was noncustodial at the outset but eventually became custodial before NavaAdame admitted to engaging in sexual acts with one of the victims. Because the law enforcement officer conducting the interrogation did

2

not advise NavaAdame of his *Miranda* rights at the time the interrogation turned custodial, NavaAdame's statements thereafter should have been suppressed at trial. And, given the balance of the evidence presented to the jury, we cannot say the trial court's error in admitting those statements was harmless beyond a reasonable doubt. Accordingly, we reverse the judgment.

FACTS

After fostering P.N. and I.N. for a period of time, NavaAdame and his wife adopted them when they were six and three years old, respectively. At times relevant to this case, they lived in a house with other family members. NavaAdame's biological son, J.N. and J.N.'s girlfriend, K.G. occupied a downstairs bedroom. The master bedroom used by NavaAdame and his wife was upstairs, as was the bedroom shared by P.N. and I.N., and another bedroom occupied by NavaAdame's biological daughter.

When P.N. was almost 17 years old, she told a friend's mother about years of alleged sexual abuse inflicted on her by NavaAdame. Her revelation and NavaAdame's self-initiated contact with law enforcement led to NavaAdame eventually being arrested.

The arrest and filing of charges eventually led to an amended information alleging the following 11 counts: count 1, sexual intercourse or sodomy with a child 10 years old or younger (Pen. Code, § 288.7, subd. (a));[1] count 2, lewd acts upon a child under 14 years old (§ 288, subd. (a)); counts 3 and 11, continuous sexual abuse of a child under 14 years old (§ 288.5, subd. (a)); counts 4 and 5, lewd acts upon a child 14 and 15 years old (§ 288, subd. (c)(1)); count 6, unlawful sexual intercourse of a person over 21 years old with

---

[1] All further statutory references are to the Penal Code unless indicated otherwise.

a minor under 16 years old (§ 261.5, subd. (d)); count 7, unlawful sexual intercourse with a minor more than three years younger (§ 261.5, subd. (c)); count 8, sexual penetration or oral copulation of a child 10 years old or younger (§ 288.7, subd. (b)); count 9, aggravated sexual assault of a minor (§ 269, subd. (a)(1)); and count 10, rape by force or fear (§ 261, subd. (a)(2)). The information also alleged certain enhancements (§ 667.61, subds. (a), (b), (e), (j)(2)).

Prior to trial, the court heard various motions in limine, including one from each side concerning statements made by NavaAdame to law enforcement on the day he was arrested. The prosecution sought to have the statements, which included admissions as to P.N., deemed admissible. Defendant sought to suppress the statements on constitutional grounds. The court ultimately deemed them admissible.

At trial, the prosecution's case consisted of testimony from P.N., I.N., and two law enforcement officers.

P.N. testified she had a good relationship with NavaAdame and she considered him her dad even though they were not biologically related. She said NavaAdame started touching her in a sexual manner when she was about 10 and a half years old and it lasted until she eventually told someone about it when she was almost 17 years old. When it was dark at night, he would come into the bedroom she shared with I.N. and start touching her, making skin-to-skin contact all over her body and penetrating her with his finger. Eventually, NavaAdame began having vagina intercourse with P.N. in her bedroom and the kitchen. It would occur most days, sometimes multiple times per day, and at night when others living in the house were in their bedrooms. There were points at which I.N. witnessed things taking place, and one time J.N. almost walked in on an occurrence in the kitchen. P.N. did not

4

tell anyone because she was scared she and I.N. would be separated and put back into the foster care system.

I.N. testified she observed NavaAdame having sexual intercourse with P.N. on multiple occasions, sometimes early in the morning and sometimes at night. When I.N. was about 10 or 11 years old, NavaAdame began engaging in sexual activities with her, including sexual intercourse, at night and in the early morning. When P.N. notified law enforcement, I.N. was 13 or 14 years old and the last occurrence involving I.N. was roughly two weeks prior to P.N.'s interview with law enforcement. I.N. said she was interviewed on four or five occasions around that time and she denied any sexual abuse toward her or P.N. because she wanted to protect her family. She finally revealed what happened to her when interviewed by law enforcement four years later. On cross-examination, defense counsel elicited information about P.N. and I.N.'s strained relationship, with I.N. relating they do not get along at all and P.N. had a general reputation of not being honest about things. However, I.N. said P.N. was telling the truth about what NavaAdame did to P.N.

Matthew Baltierra, a deputy sheriff at the time of NavaAdame's arrest, briefly relayed his investigation into P.N.'s allegations when they originally surfaced. He interviewed P.N. at school and later spoke with NavaAdame when he came into the sheriff's department before being arrested. The audio recording of Deputy Baltierra's interrogation of NavaAdame was played for the jury. Deputy Baltierra confirmed the last alleged incident involving P.N. occurred four to five days before he interviewed her. P.N. did not undergo a sexual assault examination. And, while Deputy Baltierra collected a DNA sample from NavaAdame, he did not know what happened to it thereafter.

5

Taylor Long, a detective at the time of NavaAdame's arrest, relayed his involvement in the investigation of P.N.'s original allegations. Among others, he spoke with P.N. and with NavaAdame before he was arrested. His two-part interrogation of NavaAdame, during which NavaAdame eventually admitted to having sexual intercourse with P.N., immediately followed Deputy Baltierra's interrogation. The audio recording of Detective Long's two-part interrogation was played for the jury. On cross-examination, Detective Long confirmed he served a search warrant at NavaAdame's residence, taking two blankets from P.N.'s bed and the top portion of her mattress. By the time of trial, none of those items were tested for DNA.

Testifying for the defense were K.G., J.N., a child protective services (CPS) investigator, and a nurse practitioner who testified as an expert.

K.G., who was in her early 20's at the time NavaAdame was arrested, explained she worked as a medical assistant at the time and lived in the house with NavaAdame's family. She and J.N. shared the downstairs bedroom in the house, along with their then 2-year-old son. During the two years she lived in the house before NavaAdame was arrested, K.G. never heard or saw him sexually touch P.N. or I.N., and neither of the girls said anything about it to her.

J.N., who was in his late 20's when NavaAdame was arrested, confirmed the living situation conveyed by K.G. He lived in the house the entire time of the alleged abuse, and would come home in the evening after work, but he never saw or heard NavaAdame sexually touch or have sexual intercourse with P.N. or I.N.

A CPS investigator testified she interviewed I.N. four years after NavaAdame's arrest, when I.N. was almost 18 years old. I.N. revealed she previously lied and NavaAdame had, in fact, had sexual intercourse with her. I.N. could not remember a lot of details, conveying she tried to forget things because the memories were painful.

The last defense witness was a nurse practitioner who testified as an expert. Among her experience, she spent eight years as a pediatric sexual assault examiner and performed over 500 sexual assault exams. After explaining the general nature of a sexual assault exam, the expert explained that State guidelines indicate such an exam of a person 12 years or older may be completed up to five days after the last potential sexual contact. During the five-day time frame, and depending on the circumstances of a particular situation, it is still possible to find traces of DNA evidence on the victim. She opined, based on a hypothetical set of facts consistent with those in this case, a person in P.N.'s position should have undergone a sexual assault exam at the time of first contact with law enforcement.

In the end, the jury found NavaAdame guilty on all counts and found true the various enhancements. The trial court sentenced him to 120 years to life in prison, plus a six-year determinate term.

NavaAdame timely appealed.

DISCUSSION

NavaAdame challenges the admissibility of statements he made to officers before being formally arrested. He contends the statements resulted from a custodial interrogation without the advisement of rights under *Miranda*, the law enforcement officers involved violated his Fifth Amendment right to counsel, and the eventual admissions he made were involuntary. In addition, he argues the trial court erred in joining together

7

the case involving P.N. and that involving I.N. We conclude the first argument has partial merit, meaning the portion of NavaAdame's statements to law enforcement in which he admitted to engaging in sexual acts with P.N. should have been excluded at trial, and the trial court's failure to do so was prejudicial under the circumstances.

I.

*MIRANDA* CUSTODIAL INTERROGATION

Prior to trial, the prosecution sought to have the trial court deem admissible NavaAdame's statements to police on the day he was arrested. NavaAdame moved to suppress those statements, arguing, among other things, they were made during a custodial interrogation and he was not advised of his *Miranda* rights before making them. After holding an Evidence Code section 402 hearing, which included testimony from the two officers to which NavaAdame made the relevant statements, the trial court concluded the interrogation was not custodial and, thus, there was no *Miranda* violation. NavaAdame contends the court's determination was in error. We agree, in part.

A. *Relevant Facts*

On the day of his arrest, NavaAdame went to the San Bernardino County Sheriff's Department to, in his own words, "turn [him]self in." Before he was ultimately arrested, he spoke with two sheriff's deputies during three back-to-back sets of questioning—one with Deputy Baltierra and two with Detective Long. All questioning took place in a small interview room, furnished with a table and two chairs, which was located in an area not accessible to the public. The door to the room remained closed throughout, but it was not locked.

1.  Interrogation, Part One

Deputy Baltierra, wearing a standard patrol uniform, was the first to question NavaAdame. After introducing himself and before proceeding further, Deputy Baltierra stated, "You're not under arrest, um, free to leave at any time, just let me know. We're just trying to clear up the situation that you had talked to my partner about, about, um, you said you had a warrant or something like that?" NavaAdame responded, "No, I don't have a warrant. Um, l said I wanted to turn myself in . . . ."

NavaAdame relayed an incident that occurred a few days prior which started when P.N. sat down on his lap while he was on the couch watching television. He pushed P.N. up from behind and told her she was too old to sit on his lap. The next day, P.N. went to stay at a friend's house and NavaAdame's wife seemed upset. Those reactions led NavaAdame to think he did something wrong, so he called 9-1-1 to turn himself in "for child molestation." The dispatcher told him someone would come to pick him up, but no one did. So NavaAdame waited another day, called back, and talked to Deputy Baltierra's partner; he "asked [NavaAdame] to come over [to the station]."

Deputy Baltierra and NavaAdame engaged in additional back and forth conversation, led by the deputy's questions, about the circumstances of the incident which occurred a few days prior and NavaAdame's relationship with P.N. NavaAdame denied there being any prior situations involving P.N. that made him feel uncomfortable with what took place. Deputy Baltierra then stated, "Now, the only thing I'm trying to kind of figure out is, uh, how the conversation went with you and my partner, uh, because he heard that I guess something had slipped and went inside of her, uh, which I don't think you're a bad person. I know, we've had a

9

conversation for 10 minutes now. I just want to know what happened so we can get past it." NavaAdame responded, "I don't know if my fingers go in the wrong place or something."

The interview led by Deputy Baltierra's questioning continued, with the deputy taking a break and offering NavaAdame some water at one point. Whenever the questioning turned to asking about prior instances of touching P.N., NavaAdame gave unqualified denials. Eventually Deputy Baltierra said they were "almost finished" and he stepped out of the room.

2.  Interrogation, Part Two

Deputy Baltierra returned with Detective Long. Before Detective Long proceeded with any questioning, he let NavaAdame know they wanted to "collect a sample of [his] DNA and it [would] hopefully rule out the[] allegations that [were] being made against [him]." After stating, "Um we'll be able to prove that your DNA is nowhere that it should [*sic*] be," Detective Long asked, "[D]o you have any problems with us collecting that?" Then the following exchange took place:[2]

"J. NavaAdame: No, why, what is that . . . what's going on?

"Det. Long: I'm sorry?

"J. NavaAdame: What's goin on that you guys need that?

"Det. Long: Well, it's the same thing we were talking about earlier about how, you know, you said that you had grabbed her and moved

_____

[2] The transcript of the interview in the record indicates Detective Long was the sole person exchanging words with NavaAdame during this part of the interrogation. However, the audio recording, which is also in the record, appears to indicate there were two male officers speaking. Detective Long testified Deputy Baltierra was in the room during the DNA collection and left thereafter.

her away, um, but in the call there was more information, uh, that your wife had, had the conversation I guess with one of [P.N's] friends and that's what I was asking you before, hey was there any other time . . .

"J. NavaAdame: Mm-hmm.

"Det. Long: . . . um, that you could think of that would bring this up and what he is asking you is for that DNA, that rules that out so we can prove that that didn't happen.

"J. NavaAdame: OK.

"Det. Long: You don't have any problems with that? OK, all right.

"J. NavaAdame: So, before you guys do that do I have to get a lawyer for that or something?

"Det. Long: I'm sorry?

"J. NavaAdame: Uh, do I have, do you have to get a lawyer for that or something or [ . . . ]

"Det. Long: For what?

"J. NavaAdame: . . . before you guys do that?

"Det. Long: No, not at all.

"J. NavaAdame: Oh, OK.

"Det. Long: No, we're, we're asking you if you want to give us a sample of your DNA. It will be compared to whatever we have in the case, um, and, you know it'll, it'll rule out, you know, you being anywhere that you weren't supposed to or to be an alleged [*sic*].

"J. NavaAdame: OK.

"Det. Long: Does that make sense?

"J. NavaAdame: Yeah.

"Det. Long: Do you have any problems with that?

"J. NavaAdame: No [inaudible]."

After the DNA sample was taken, NavaAdame gave his approval for Detective Long to shut the door of the interview room so they would not "get any background noise." He then responded "[n]o" when Detective Long said, "Um, so no one forced you to come and no one, no one's, you haven't been arrested or anything like that?"

Following a variety of preliminary questions, Detective Long turned to inquire about the incident which occurred a few days earlier, and NavaAdame provided details. When Detective Long asked whether one of NavaAdame's fingers went into P.N.'s bottom or vagina, NavaAdame responded, "No, I don't know[,] I really don't know."

Eventually, Detective Long turned to direct questioning about other sexual activity. NavaAdame repeatedly denied having sexual intercourse with P.N. or having touched her in a sexual manner. When Detective Long then informed him bedding from P.N.'s bed would be tested for DNA, he said his DNA would not be found on it. And, after being told P.N. was "making some allegations, um, of sexual abuse" beyond the incident that occurred a few days before, NavaAdame repeatedly stated he did not know why she would say such things.

Before taking a break, Detective Long said he could make a call to try to get someone to administer a polygraph test and asked if NavaAdame would be willing to take one. NavaAdame responded, "Right now I'm very nervous so I don't know." After a few more questions, Detective Long said, "OK. All right. Um, give a, give me a couple minutes. Let me talk to my partner and then we'll wrap this up and then, uh, we'll go from there, OK?" NavaAdame answered affirmatively.

3. Interrogation, Part Three

When Detective Long returned, the next roughly six minutes proceeded as follows:

"Det. Long: Hi, Javier. So my . . . my partner and I, um, you know, been talking to a lot of people kinda goin over- over everything. Um, and our investigation, it shows you're not, you're not being truthful with us right now. You know what I mean?

"Um, it- it shows that you and [P.N.], something's been going on between you two for a long time. Um, we know that you guys have had sex together. Okay? It's no longer a matter of if it happened, it's a matter of why it happened. Okay? Um I get it, you know. Um, some- sometimes you have, you have teenage girls that develop and things start moving and . . . and it's, it's a way to show- show affection. It's a way to show. . . to show how you love somebody, um . . . but at the, at the same time you're- you're- you're her, you're her father. You're her adoptive parent.

"Um, when you guys took the commitment to adopt somebody, um you essentially took an oath that you're gonna put that child ahead of you for the rest of your life. Um, it's . . . in . . . in someone in your position it's . . . it's almost more so than giving birth to a- to your own child. Because, you know, you have, you have people that'll have kids and- and they didn't mean to or they necessarily didn't want to, but you guys made a conscious decision to take these two kids into your home, to love them and- and to treat them right. And to put- put them a- put them ahead of you for the rest of your life. Okay?

"Um . . . in this, in this instance, I- maybe you, maybe you were doing this out of love, maybe you were doing this out of- out of affection, maybe this is how, maybe culturally, maybe there's something going on, this

13

is how you show love, this is how you show affection for-for somebody. Um . . . but at the same time, [P.N.] is in a place right now where she needs, she needs closure, she needs a way to move on with her life so she can be a normal, normal person to grow up and- and live a healthy life, okay? You're- you're supposed to be the person that's supposed to protect her and take care of her, um, however something has happened to her and it's at your hand, okay? And we can't go back and change the past. We can't change what happened between you and [P.N.], but all we can do from- from this moment on is we can change how we go about it, how we- how we make things right.

"Um, if you sit here today and just simply tell me, 'No, that never happened, that didn't happen.' You're essentially- essentially just saying 'F U' to [P.N.] and calling her a liar. That doesn't give her any kind of, any kind of closure. It doesn't help her understand why, why this happened, okay? I don't- I don't think you're [a] bad person. I think you're a father. I think you go to work every day. You- you try to provide for your family. You take in these two girls, you're- you're giving . . . you're a giver, and I- and I see that. I don't think you're a bad person. I don't think you're some- some pervert, I don't think you're some- some deviant out there looking to take advantage of- of little kids and- and rape them and . . . and, and have- have your way with them. Okay? I- I think that you- you're just a father and you have- have a different way of showing how- how you love someone. Okay?

"I bet there's not a whole lot that you [wouldn't] do for [P.N.]. Am I right in saying that?

"NavaAdame: Um, I'm sorry. Say that again.

"Det. Long: You would go above and beyond to give to [P.N.], to take care of her.

"NavaAdame: Yes. Alright. I always do well [inaudible 00:03:38]. Say that to her.

"Det. Long: So- [crosstalk 00:03:41] So why did this happen between you and [P.N.]?

"NavaAdame: I don't know out of habits.

"Det. Long: Did she, did she come onto you ever?

"NavaAdame: I don't know. Does that really matter?

"Det. Long: Well it it helps me understand what is going on. Cause look it- there's two different pictures that can be painted. There's one where you have a child who's in fear every night that somebody's gonna be knocking on her door and they're gonna rape her. They're gonna have their way, way with her. Or you have this picture where the child is engaged with her father and it's- in their own way it's their way of showing how they love each other. Um, and it's it's it's their own thing. That's different. That's somebody who thinks they're doing something for the child. And in all reality maybe it's not the, not the best thing for them and it probably shouldn't be happening but at the same time, you're not inflicting pain. You're not inflicting trauma. Um, I said . . . I don't know I'm not there. That's [why] I'm asking you why, why did this happen?

"NavaAdame: I don't know I guess I don't know . . . (pauses) I really don't know.

"Det. Long: Well what can we tell [P.N.] about why why this happened?

"NavaAdame: I don't know cause what- whatever I say is, is, is not gonna help isn't it?

"Det. Long: Well I mean, do you love her?

"NavaAdame: Yeah of course. Of course I do. Of course I do.

15

"Det. Long: Okay. But what you gotta- you gotta understand people, people are able to understand. They can relate to somebody who's doing something out of love. They think they're doing the right thing, okay. Maybe- But they're actually- Maybe they're making the wrong decision, for the right reasons. Does that make sense? [¶] You know somebody who goes and steals an Xbox from, from the store. Just cause they wanna play an Xbox, well that person's a thief. Somebody who goes to the store and steals some, some chicken and a can of green beans cause they wanna feed their families . . . You see the difference there? But if you just talk to some- I didn't do it, I didn't do it. You group those two people together. You just have two thieves. If you don't- if you don't get any of the backstory, you don't- you don't get an understanding as to what was going on. I have . . . We need to humanize this. We need to figure out what, what happened. We need to figure out what brought you to have sex with [P.N.]. And what can we do from here on out to make, make the situation right?"

Thereafter, NavaAdame proceeded to confess to having sexual intercourse with P.N. multiple times a week, over the course of years.

B. *Applicable Law and Standard of Review*

"In *Miranda*, . . . the United States Supreme Court held that a person questioned by law enforcement after being 'taken into custody' must first be warned that he or she has the right to remain silent, that any statements he or she makes may be used against the person, and that he or she has a right to the presence of an attorney, either retained or appointed. [Citation.] If police take a suspect into custody and then interrogate the person without informing of such rights, the person's responses cannot be introduced into evidence to establish his or her guilt. [Citation.]

16

"The obligation to administer *Miranda* warnings attaches only when the person questioned is in "'custody.'" [Citation.] In *Miranda* jurisprudence, custody is 'a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.'" (*People v. Saldana* (2018) 19 Cal.App.5th 432, 454 (*Saldana*).) In that respect, the "primary concern is the 'psychological pressures "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely,'" which are created by "'incommunicado interrogation'" in an unfamiliar "'police-dominated atmosphere.'" [Citation.] The *Miranda* court reasoned that '[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.'" (*Id.* at pp. 454–455.)

"In determining whether a person is in custody for purposes of applying *Miranda*, the issue is whether, in light of the "'objective circumstances of the interrogation," [citation], "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" [Citation.] 'And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation.""" (*Saldana, supra*, 19 Cal.App.5th at p. 455.)

"Courts have identified factors that are relevant in determining whether the defendant was in custody during police questioning. [Citation.] 'No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest.'" (*Saldana, supra*, 19 Cal.App.5th at p.

17

455.) The relevant factors include: (1) "'whether contact . . . was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview'"; (2) "'whether the express purpose of the interview was to question the person as a witness or a suspect'"; (3) location of the interview; (4) whether police informed the person they were under arrest or in custody; (5) whether they informed the person they were free to terminate the interview and leave at any time; (6) "'whether there were restrictions on the person's freedom of movement during the interview'"; (7) length of the interrogation; (8) "'how many police officers participated'"; (9) "'whether they dominated and controlled the course of the interrogation'"; (10) "'whether they manifested a belief that the person was culpable and they had evidence to prove it'"; (11) "'whether the police were aggressive, confrontational, and/or accusatory'"; (12) "'whether the police used interrogation techniques to pressure the suspect'"; and (13) "'whether the person was arrested at the end of the interrogation.'" (*Ibid.*)

"On appeal, 'we accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was "custodial."'" (*Saldana, supra*, 19 Cal.App.5th at p. 454.)

*C. Analysis*

NavaAdame voluntarily contacted law enforcement and arrived at the sheriff's station on his own. Although such voluntary contact is a factor that weighs against a custodial finding, we must look much deeper because "even where a suspect voluntarily goes to a police station for an interview, if 'once there, the circumstances become such that a reasonable person would not feel free to leave, the interrogation can become custodial.'" (*Saldana,*

*supra*, 19 Cal.App.5th at pp. 455–456, citing *U.S. v. Kim* (9th Cir. 2002) 292 F.3d 969, 975.)

Turning to more about the setting, instead of interviewing NavaAdame at his home or elsewhere, law enforcement asked him to come to the station. The questioning occurred in a very small interview room located in an area of the station inaccessible to the public and the door to the room was closed, although not locked. "*Miranda* warnings are not required "'simply because the questioning takes place in the station house . . . .'" [Citation.] However, *Miranda* emphasized that 'the "principal psychological factor contributing to a successful interrogation is privacy"' [citation] and for that police purpose, the interrogation should occur "'in the investigator's office or at least in a room of his own choice."'" (*Saldana, supra*, 19 Cal.App.5th at p. 456.) "At the police station, "'the investigator possesses all the advantages."'" (*Ibid*.) Thus, the location of the questioning tends to show more of a custodial setting.

Deputy Baltierra's actions, however, counterbalanced matters during the first part of the interrogation. He informed NavaAdame he was not under arrest and he was free to leave at any time, he took a break and offered NavaAdame water, and he kept the tone conversational. Although Deputy Baltierra asked questions, he spent much of the time listening to NavaAdame freely narrate matters concerning the various topics covered. (*People v. Stansbury* (1995) 9 Cal.4th 824, 832 [nonaccusatory questions allowed defendant to narrate recollection of observations and actions].) As the interrogation progressed, the questioning turned away from the incident which led NavaAdame to come to the station, but Deputy Baltierra maintained an inquisitive and nonaggressive tone. Considering all the circumstances, we conclude the portion of the interrogation with Deputy

Baltierra was not custodial; a reasonable person would have felt free to walk out the door.

As for Detective Long's first contact with NavaAdame, the questioning was more formal and the tone was more direct than what took place with Deputy Baltierra. Although Detective Long asked questions about the incident that occurred a few days earlier, he focused more on inquiring about other sexual contact with P.N., something which NavaAdame repeatedly denied. And, after NavaAdame agreed to provide a DNA sample and was told bedding would be tested for DNA, Detective Long revealed P.N. was alleging NavaAdame sexually abused her through sexual intercourse. Thereafter, Detective Long added a discussion of polygraph tests and an inquiry into why P.N. would lie about such serious things.

Although questioning became more pointed, the tone became more accusatory, and Detective Long conveyed skepticism, the overall circumstances did not yet rise to the level of a custodial interrogation. (See *People v. Moore* (2011) 51 Cal.4th 386, 402 (*Moore*) [police expression of suspicion, with no evidence of restraint on person's movement, does not necessarily convert voluntary presence at interview into custody].) In response to a preliminary question, NavaAdame confirmed he voluntarily came to the station and had not yet been arrested. Detective Long closed the door, but only after he asked NavaAdame if it was okay to do so, and NavaAdame remained unrestrained.

The balance of factors shifted when Detective Long returned to the room for the third part of the interrogation after taking a break. At that point, the questioning had been ongoing for approximately one and a half hours. Unlike the other parts of the interrogation which proceeded in a question-answer format, the first six minutes of this final portion consisted

20

almost exclusively of monologues by Detective Long in which he employed multiple types of well-known interrogation techniques designed to elicit confessions.

As Detective Long conveyed after informing NavaAdame that they knew he was not being truthful, it was "no longer a matter of if it happened, [it was] a matter of why it happened." Despite NavaAdame's prior repeated denials, Detective Long effectively foreclosed any continued factual dispute about his guilt and shifted the focus to why it occurred and how NavaAdame could give P.N. "closure." He minimized the moral seriousness of things in various ways, including by: (1) suggesting NavaAdame may have done things out of love and may simply have been trying to show affection; and (2) by saying he did not think NavaAdame was a "bad person" or a "deviant out there looking to take advantage of . . . little kids," but instead "just a father . . . [who has] a different way of showing how . . . [he] love[s] someone." And, he strategically juxtaposed "two different pictures that can be painted" of the situation—one, "a child who's in fear every night that somebody's gonna be knocking on her door and they're gonna rape her," and two, "the child is engaged with her father and it's . . . their own way . . . of showing how they love each other"—which suggested to NavaAdame he would feel better if, in conjunction with a confession, he provided the less morally culpable of the two offered explanations for his conduct.

As the custodial factors had increased over the course of the interrogation, the sudden pointed accusations combined with a barrage of interrogation techniques in a series of confrontational monologues would lead a reasonable person to believe they could not simply end the interview and walk away notwithstanding anything to the contrary said by the interrogators. (See *Saldana, supra*, 19 Cal.App.5th at p. 458 ["[W]hen a

21

suspect has been told by the police that he is not under arrest and can leave at any time, but the contemporaneous conduct of the police nullifies that advice, the advice 'will not carry the day'"]; *U.S. v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1088 ["mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial *per se*"].) This is so even though Detective Long maintained a professional demeanor throughout. (See *People v. Torres* (2018) 25 Cal.App.5th 162, 179 (*Torres*) ["a pleasant and conversational tone of voice does not permit the type of coercive police practices that are impermissible in the absence of *Miranda* warnings"].)

The Attorney General likens the circumstances of this case to those in *Moore*. There, a police officer asked the defendant if he was willing to be transported to the police station to give a statement since he was the last person to see the victim alive. (*Moore, supra*, 51 Cal.4th at p. 396.) Once in a police station interview room, an investigator told him he was not under arrest and was free to leave. (*Id.* at p. 402.) The interrogation lasted roughly one hour and 45 minutes, with the beginning questioning viewing the defendant as a witness and later questioning turning more accusatory and skeptical. (*Ibid.*) The investigators asked the defendant whether he burglarized the victim's house, urged him to be honest, and inquired about his prior arrests and other matters that "conveyed their suspicion of [the] defendant's possible involvement." (*Ibid.*) In the end, they denied the defendant's request to be taken home and read him *Miranda* advisements. (*Id.* at pp. 401–402.)

The Supreme Court concluded the station interview was not a custodial interrogation. The defendant was asked and agreed to come to the station, it was thereafter reconfirmed he was only there to give a statement,

22

and he was not restrained. (*Moore, supra*, 51 Cal.4th at p. 402.) The length was "fairly long[,] . . . but [it was] not, as a whole, particularly intense or confrontational." (*Ibid*.) And, while investigators eventually interjected some accusatory and skeptical questions, and urged the defendant to be honest, that was not enough to convert the defendant's otherwise voluntary presence at the station into custody. (*Ibid*.) In this respect, the high court noted the investigators did not claim to have evidence of the defendant's guilt or know he was guilty until they actually arrested him. (*Id*. at p. 403.)

We view *Saldana* as better informing the circumstances of this case rather than *Moore*. In *Saldana*, the defendant voluntarily agreed to be questioned as a suspect about allegations of child molestation and walked to the police station by himself. (*Saldana, supra*, 19 Cal.App.5th at pp. 455–456.) He was questioned in a closed-door interrogation room in the station, was not restrained, and was informed at the outset that he was not under arrest and could leave when he wanted. (*Id*. at p. 456.) Roughly 30 minutes later, after police dominated, accusatory questioning which used various interrogation techniques, the defendant confessed. (*Id*. at p. 457.)

The Court of Appeal considered the totality of the circumstances and concluded the interrogation was custodial. (*Saldana, supra*, 19 Cal.App.5th at p. 461.) The tipping point was the confrontational and accusatory questioning. (*Id*. at p. 462.) Rather than simply confront the defendant with adverse evidence, and despite the defendant's repeated denials, the questioning detective presented unqualified assertions of his guilt and insisted he was not being truthful. (*Id*. at pp. 459–460.) And, the classic interrogation techniques used "conveyed the message that [the defendant] had no meaningful choice but to admit to some version of the

23

crime because continued denials—in light of the extensive and irrefutable evidence against him—[were] simply futile." (*Id.* at p. 460.)

What *Saldana* conveys is that the nature of the questioning may tip the balance in a given situation when viewed as part of the totality of the circumstances. Like in *Saldana*, NavaAdame voluntarily came to the sheriff's station, he was taken to a closed-door interrogation room inaccessible to the public, he was not restrained, he was advised he was not under arrest and could leave at any time, and the tone of the questioning was generally professional. Although, in contrast to *Saldana, supra*, 19 Cal.App.5th at p. 459, the questioning of NavaAdame was not "persistent, confrontational, and accusatory" during the entire duration of the interrogation, there was a marked shift which would contribute to how a reasonable person would feel about the situation.

By the third part of the interrogation, the questioning had already shifted away from the single incident for which NavaAdame came to turn himself in. Officers had persistently questioned about past sexual acts with P.N. notwithstanding NavaAdame's consistent denials, had taken a DNA sample from him, and claimed P.N.'s bedding would be tested for DNA. And their questioning continued despite statements that "we're almost finished" and "give me a couple minutes . . . and then we'll wrap this up."

Given all of the circumstances, no reasonable person faced with Detective Long's sudden lengthy, confrontational monologues at the beginning of the third part of the interrogation, which were rife with accusation and employed a barrage of interrogation techniques, would have felt they could get up and walk away. (See *Miranda, supra*, 384 U.S. at pp. 448–455 [describing techniques and monologues contained in police officer training manuals that, if employed correctly, will psychologically impact

24

interviewee such that they will eventually admit guilt instead of exercising right to remain silent].) The situation was custodial at that point, and NavaAdame should have been *Mirandized* before questioning continued.

As in *Saldana*, the tactics used with NavaAdame "are not unusual, nor are they unreasonable. In fact, if [NavaAdame] had been properly *Mirandized* and made the same confession, it might be called good police work." (*Saldana, supra*, 19 Cal.App.5th at p. 460.) "However, when police create an atmosphere equivalent to that of formal arrest by questioning a suspect who is isolated behind closed doors in a police station interrogation room, by repeatedly confronting him with the evidence against him, repeatedly dismissing his denials, and telling him at the outset he is free to leave—when all the objective circumstances later are to the contrary— *Miranda* is triggered." (*Id.* at p. 438.)

D. *Prejudice*

"[A] confession held inadmissible by reason of having been obtained in violation of the prophylactic *Miranda* requirements . . . [is] subject to a harmless-error standard of review" specified in *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Sims* (1993) 5 Cal.4th 405, 447.) That is, we assess "'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."' [Citation.] 'To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question . . . .'" (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1166.)

The erroneous admission of NavaAdame's confession was prejudicial. "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" (*Arizona v. Fulminante* (1991) 499 U.S. 279,

25

296.) Here, the jury heard the audiotaped confession and the prosecutor heavily relied on it during closing argument, repeatedly emphasizing to the jury that they heard NavaAdame's "own words." And, the remainder of the evidence effectively boiled down to P.N. and I.N.'s testimony, with the defense identifying numerous concerns. Among them were: the lack of physical evidence; the lack of corroboration from anyone else living in the same house, despite allegations the activity took place almost every day for many years; inconsistencies in P.N.'s statements over time and her consistent denial of any abuse involving I.N.; and I.N.'s initial denial of the activity involving her and P.N., followed by diametrically opposite statements four years later. Viewed together, we cannot say the erroneous admission of NavaAdame's confession was harmless beyond a reasonable doubt.[3]

II.

*MIRANDA* RIGHT TO COUNSEL

Focusing on the verbal exchange between himself and officers at the beginning of the second part of the interrogation, NavaAdame argues the officers violated his Fifth Amendment and Fourteenth Amendment rights by continuing to question him after he made an equivocal invocation of his right to counsel. On this basis, he contends all statements he made after that time should have been excluded at trial.

While NavaAdame cites various cases to support his position, he overlooks that the right to counsel he asserts, which relates to the Fifth Amendment right against self-incrimination, is only triggered by a custodial

---

[3] Because we find admission of the confession obtained in violation of *Miranda* to be prejudicial, which necessitates a new trial, we do not address NavaAdame's separate argument that the confession was involuntary.

26

interrogation. (See *Davis v. U.S.* (1994) 512 U.S. 452, 457–458; *Edwards v. Arizona* (1981) 451 U.S. 477, 485–486.) As previously explained, NavaAdame was not subjected to a custodial interrogation until Detective Long returned to the interview room for the third round of questioning. Because the alleged equivocal request for counsel took place before that time, officers did not violate NavaAdame's rights by failing to stop or seek clarification about his request.

## III.

### JOINDER

In a pretrial motion, the prosecution sought to join P.N. and I.N's cases together. Defense counsel opposed the joinder, but the trial court concluded joinder was proper and would not be unduly prejudicial under the circumstances. NavaAdame contends the trial court erred in joining the cases. Because joinder and severance are discretionary matters that require the trial court to assess a variety of circumstances, and because the overall circumstances will be different on remand given our *Miranda* conclusion, we leave the joinder issue to be addressed in the first instance by the parties and the trial court on remand.

## DISPOSITION

The judgment is reversed.

DELANEY, ACTING P. J.

WE CONCUR:

GOODING, J.

SCOTT, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064663 |
| v. | (Super. Ct. No. FVI17002285) |
| JAVIER NAVAADAME, | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

It is hereby ordered that the opinion filed on October 16, 2025, be modified as follows: On page 1, in the listing of counsel for defendant, the phrase ", under appointment by the Court of Appeal," is deleted.

There is no change in the judgment.

Defendant has filed a request that our opinion be certified for publication. The request is GRANTED, as the opinion meets the standards

set forth in California Rules of Court, rule 8.1105(c). The opinion, as modified herein, is ordered published in the Official Reports.


                                    DELANEY, ACTING P. J.

I CONCUR:


SCOTT, J.


I DISSENT:

        I dissent solely as to the request for publication. I would deny the request.


                                    GOODING, J.


2