Filed 1/28/26  P. v. Hoehl CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

|  |  |
|---|---|
| THE PEOPLE, | C099252 |
| Plaintiff and Respondent, | (Super. Ct. No. 22F3968) |
| v. | |
| ALFRED ROBERT HOEHL, | |
| Defendant and Appellant. | |

A jury found defendant Alfred Robert Hoehl guilty of several counts of sexual abuse on two of his adopted minor children.  On appeal, Hoehl contends the trial court erred in admitting into evidence his videotaped statement confessing to several of the sexual acts because his statement was given without the benefit of *Miranda*[1] warnings and was involuntary.  We agree the interrogation became custodial and the lack of *Miranda* warnings rendered the statement inadmissible.  Because the evidence against

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436.

Hoehl was overwhelming, however, we determine the error was harmless beyond a reasonable doubt. We thus affirm the judgment.

## BACKGROUND

In light of the issues raised on appeal, we need only provide a brief summary of the facts adduced at trial.[2]

Hoehl and his wife adopted seven children. R.H. and S.H., the two oldest girls, are about three months apart. Hoehl favored R.H. and was much more lenient with her than his other children. Hoehl's wife (Mother) "very frequently" left Hoehl home alone with some of the children when she took other children to medical appointments. Some appointments were out of town and involved overnight stays.

Hoehl also had an adult biological son who died in June 2018.

## A. Sexual abuse of R.H.

### 1. R.H.'s testimony and statements

Hoehl's daughter R.H. was 17 years old when she testified at trial. She testified that Hoehl sexually abused her "[e]very day," starting when she was in the sixth grade. He often abused her at night when she was asleep—she would wake up to Hoehl's penis in her mouth or his fingers in her vagina. Hoehl had sex with her about once a month, whenever Mother was out of town. He put his penis in R.H.'s mouth more than 10 times, licked her vagina more than once, showed her pornography approximately 20 times, and forcibly inserted a dildo into her vagina on three occasions. She testified, "There's no point in telling him no when he's not even going to listen. I tell him it every time."

Although it was difficult for R.H. to remember each specific incident of abuse, she described several instances in detail, including that the abuse started in and escalated

---

**2** Due to a statewide shortage of court reporters, the trial court ordered the proceedings to be electronically recorded. Hoehl does not challenge this aspect of the record.

2

through the sixth grade. After the first time Hoehl touched her inappropriately, he told R.H. that if she told anyone about what had happened, no one would believe her, she would be separated from her sisters, and she would die. R.H. tried to keep a journal chronicling the abuse but Hoehl found out about it and threw it away.

According to R.H., others witnessed Hoehl sexually abusing her. One time, her sibling S. walked in on Hoehl touching her. Afterwards, R.H. told S. that Hoehl had been "doing stuff" to her, but she told S. not to tell anyone. On one, possibly two, separate occasions, one of her sibling's friends, Anthony, walked in on Hoehl touching R.H. She asked Anthony not to tell anyone and said she was safe.

R.H. threatened to expose Hoehl "all the time," but did not do so because she was scared. R.H. also had trust issues with everyone, including Mother, and she did not think Mother would believe her.

R.H. testified that as a result of her fear, she initially denied that Hoehl abused her and instead told the police that anyone saying differently was lying. A few days after speaking with law enforcement, R.H. spoke with a woman from Child and Family Services, Rita Ingram,[3] but R.H. was still not honest about the extent of the abuse because she was scared and in shock. She did not tell Ingram that Hoehl had abused her "almost every night," or had showed her pornography, or had used a dildo on her.

*2. Other witnesses to Hoehl's actions with R.H.*

R.H.'s brother S. described two encounters between Hoehl and R.H. that he witnessed. In the first instance, through a cracked door, he saw R.H. and Hoehl lying on her bed whispering to each other. Hoehl was rubbing R.H.'s thigh. S. did not go into the room or say anything, and he did not think they saw him.

---

[3]     Ingram was trained in child forensic interview techniques.

About a week or two later, S. opened the door to his parents' room and found Hoehl pulling down R.H.'s pants as she laid on her back in the bed. She had a shirt on, but her pants were halfway down her thighs. S. went to his room, and his brother I. was there. Hoehl followed and said, "[i]t wasn't what it looked like." S. told I. what he had seen. A week or so later, S. told Mother what he "thought was going on."

I. confirmed S. came to him "[f]reaking out" about Hoehl and R.H. Hoehl came into the room acting nervously and said, "it didn't look like what it seemed like."

I. also testified that he saw instances of Hoehl tickling R.H. "around some of the private parts," including her "[v]agina," "[b]oobs," and "[b]utt." I. also confirmed that his friend Anthony told him that he "saw [Hoehl] and [R.H.] on the bed with [R.H.] on her hands and knees on the bed and in some weird position. And he was saying that they were starting to get naked." I. did not tell Mother because he did not want to believe it was true, he was scared, and he was concerned Mother would not believe him.

The day law enforcement became involved, R.H. told I. that Hoehl had been doing inappropriate things with her. R.H. was "[j]ust broken, couldn't speak." According to I., "sometimes" R.H. made false accusations "[a]bout certain things" but not about rape.

Anthony, I.'s friend, testified that whenever he was at the Hoehl residence, Hoehl and R.H. were "always" near each other. One time, Anthony went to Hoehl's bedroom and saw Hoehl "had [R.H.] bent over" his bed while he stood behind her. Her chest was on the bed and "her butt was sticking more out towards" Hoehl. Anthony told I., who seemed upset. Anthony also talked to R.H. about what he had seen and asked if she was okay. He did not remember her reaction, but she "didn't really say anything" and changed the subject. Anthony initially told law enforcement he had not seen anything sexual between Hoehl and his children because, at that time, he was "scared and nervous, and didn't really want to, like, hurt both sides of the family."

4

## B. Sexual abuse of S.H.

S.H. was nervous, emotional, and scared of Hoehl; she required multiple breaks while testifying. She testified that Hoehl touched her inappropriately for the first time when she was 12 years old and in fifth grade. At that time, Hoehl tucked her into bed and used his hand to touch her over her clothes on her vagina.[4] S.H. said Hoehl touched her just about every night, sometimes skin to skin. S.H. also said Hoehl often touched her breasts. Although sometimes he touched her for medical purposes, other touches were "inappropriately" on her "back part and other places."

Hoehl also touched S.H. with his penis and wanted her to touch him there too, which she did under protest.

According to S.H., sometimes this touching would happen while S.H. was in bed with both Hoehl and Mother, while Mother was asleep.[5] More than once, Hoehl showed S.H. pornography on the computer in his bedroom.

Initially, S.H. testified Hoehl had not inappropriately touched her with anything other than his body. On her second day of testifying, however, she admitted he had touched her vagina with something that hurt and left scars, but she could not identify that object.

When she first spoke to law enforcement, she was scared and did not tell the police that Hoehl had abused her. When she spoke with someone a few days later, she

---

**4**    S.H. used the terms "[l]ower part" that "[r]eproduces" to refer to both her and Hoehl's body parts. The prosecutor then showed her an anatomical drawing of a naked female, and she used this to indicate Hoehl touched her vagina and breasts. She made similar indications on an anatomical drawing of a naked male when asked to identify any areas Hoehl wanted her to touch; she circled the penis.

**5**    According to Mother, the children sometimes ended up in the couple's bed when they had trouble sleeping. Mother was a heavy sleeper, so "half the time [she] didn't even know if they were in there."

only discussed two incidents of abuse. She explained that Hoehl threatened her multiple times that she would ruin their family and lose everything "if something happened."

## C. Mother's testimony

Mother's relationship with Hoehl had been "strained" prior to her learning about his abuse. She believed Hoehl had "let [R.H.] get away with all kinds of things that she shouldn't have," and he favored her "a lot more" than the other children. R.H. had mental health issues and issues with honesty; she lied to Mother "[a] lot." Mother wanted to place R.H. in "a treatment facility," but Hoehl threatened to leave if she did so.

Mother never saw any inappropriate sexual touching between Hoehl and R.H. or S.H. but in general, Mother felt R.H. was "way too old" for behaviors she witnessed, such as sitting on Hoehl's lap, kissing on the lips, holding hands, and being tucked into bed. According to Mother, if R.H. and S.H. did not want to be tucked into bed, Hoehl would tell them that meant they did not love him. Mother also explained that when they drove places, she would extend her hand for him to hold but he would reach back and hold R.H.'s or S.H.'s hand instead. He also kissed S.H. on the lips. Mother shared her concerns with Hoehl about his relationship with R.H., but he did not change his behavior. She described one incident where she found Hoehl in R.H.'s room in the middle of the night and, having an "uneasy feeling" about it, told him to leave the room.

Neither R.H. nor S.H. told Mother that Hoehl had been abusing them. When Mother learned of the accusations, she was "in shock" and did not initially believe the allegations by R.H. and S.H., yet she did not think R.H. would fabricate allegations of sexual abuse. Because of the shock, she did not initially mention to law enforcement Hoehl's concerning behavior, such as him holding hands with or kissing R.H. and S.H.

After Mother's initial contact with law enforcement, she spoke with Hoehl about the abuse allegations. He told her that R.H. "would expose herself to him, that she did give him oral copulation." Mother asked Hoehl if he had "penetrated" R.H., and "[h]e said no. He did touch her, though. It happened multiple times."

6

**D. Hoehl's interview with law enforcement**

Despite the fact that officers had not reached out to him, On November 21, 2019, Hoehl showed up at the police station and agreed to speak with Detectives Justin Brewer and Greg Kettle. The interview primarily focused on R.H. because she was the only child at that time who had disclosed sexual abuse. At trial, the People played People's exhibit No. 3, a video recording of Hoehl's interview, which was admitted into evidence. The jury was given a copy of the transcript while the interview played.

At the beginning of the interview Detective Brewer told Hoehl he was not under arrest, that Hoehl could leave at any time, and that Detective Brewer just wanted to know what happened leading up to R.H.'s accusations. Hoehl initially denied inappropriately touching R.H. Hoehl thought that R.H. accused him of molesting her because she was venting her frustrations out on him after she was attacked at school by other girls. R.H. has reactive attachment disorder, attention deficit hyperactivity disorder, and "Tourettes or somethin' " and "makes allegations about all kinds of things about all kinds of people" (though not usually to this extent). He suggested her accusations were based on what she had seen on social media or learned at school. Hoehl also knew R.H. had been exposed to sexual activity because her birth parents molested and physically abused her. And he reported that R.H. had her phone taken away because "she was talkin' about doin' [sexual] things to boys in school."

Hoehl described himself as an "affectionate" father, who hugged and kissed his children "all the time" and tucked R.H. and S.H. into bed every night. The family "kiss[ed], and hug[ged], and snuggle[d], and stuff." Eventually he acknowledged, "there might've been times where it seemed like it was inappropriate stuff, you know," like when he rubbed the girls' bellies at night to alleviate stomach aches.

Later, Hoehl claimed there were times when R.H. had "flash[ed]"him and "tr[ied] to get [him] interested," but he "would reject all that." R.H. did "a little jig" with her "[b]oobs" to get his attention and exposed her vagina.

7

Approximately an hour into the interview, Hoehl eventually conceded that "things mighta gone a little too far sometimes" with R.H. He acknowledged, "there might have been some, uh, inappropriate touching then or whatever . . . ." When asked if he had touched her "[p]rivate areas," Hoehl responded, "I don't know if it's slipped down there, maybe." When asked how the "blowjobs" happened, Hoehl said he "never did anything to [R.H.] that she didn't want," and that "[s]he is [a] very knowledgeable kid." He then admitted to several sexual acts, including "blowjobs," touching her vagina, rubbing her leg with his penis, and putting his mouth on her vagina. Hoehl conceded that he "may have" worn a condom, although he did not think that he had "sexual[ly] penetrat[ed]" R.H. Hoehl offered, "Maybe we thought about it." Later still, Hoehl stated, "I never fully penetrated that girl, ever," before acknowledging, "we went, got close to it or whatever, it—once, I did have a rubber on."

Although no allegations had been made by S.H. at the time of the interview, Hoehl also discussed S.H. and her medical issue that made her "unable to use the restroom" without a suppository, which Mother made him insert into S.H.

At the end of the interview, Hoehl agreed to write R.H. a letter. That letter, which was admitted as People's exhibit No. 4, read, "[R.H.], I love you. Dad. Sorry, sweetheart." After the interview concluded, the detectives allowed Hoehl to leave but arrested him later that night.

## E. Defense

Hoehl testified at trial. He discussed his family, including his biological son who, in June 2018, bled to death in the son's bed. Hoehl testified that he had to clean out his son's apartment and when he came upon the bloody bed, he had a "stroke or some kind of a mental crisis" that "was quite a strike on [his] mental faculties."

Hoehl also specifically testified about R.H. who, according to him, "lied quite a bit" and "it was pretty common for her to tell fibs," and about S.H. who was "extremely emotional for any reason." Hoehl said he barely recognized his children talking about

8

him and that R.H. and S.H. were either lying or confused; "somebody has been coercing them for three years."

Hoehl denied inappropriately touching R.H. or S.H. Hoehl maintained he had touched the "intimate parts" of S.H.'s body only for medical reasons.

Hoehl acknowledged that during the interview with the detectives he "might have said" he inappropriately touched R.H.'s vagina a "handful of times" and that oral sex "happened a couple of times." He also "may have" said that he had used a condom and "may have" admitted that he told R.H. that she would break up the family if she talked about the abuse. Hoehl explained, "it's not clear in [his] mind what occurred the whole interview," and he had trouble remembering "things that were accusatory." Hoehl said the detectives "were badgering continuously," and "wanted to hear a story," and they got one. Hoehl explained that during his law enforcement interview, he was feeling self-destructive because he "felt that the weight of the world was on [his] shoulders, and [he] was done with it." He was grieving his son, his children were "accusing [him] of things," his wife was "betraying" him, and "nobody cared anymore."

Hoehl also explained that when he told Mother that he had sexually abused R.H., he was "trying to evoke" her anger because she had been "betraying" him. But he admitted that he did say the things to which she testified.

Hoehl also acknowledged the letter to R.H. was in his handwriting and admitted he wrote it, but said he did not remember doing so. He denied that he was apologizing for touching R.H. inappropriately.

## F. Verdicts and Sentence

The jury found Hoehl guilty as charged of: oral copulation with R.H. (Pen. Code, § 287, subd. (c)(1) (counts 1-5));[6] sexual penetration of R.H. (§ 289, subd. (j) (counts 6-

---

[6] Undesignated statutory references are to the Penal Code.

15)); a lewd and lascivious act upon R.H. (§ 288, subd. (a) (count 16)); and lewd and lascivious acts upon S.H. (§ 288, subd. (a) (counts 17 & 18)). The jury also found true the allegation that as to counts 1 through 15 that Hoehl had substantial sexual conduct, to wit: oral copulation and/or penetration, with R.H. (§ 1203.066, subd. (a)(8)).[7]

The trial court sentenced Hoehl to a total determinate term of 40 years in state prison as follows: six years on count 1 and consecutive two-year terms on counts 2 through 18.

Hoehl filed a timely notice of appeal.

## DISCUSSION

Hoehl contends his videotaped interview with the detectives was inadmissible because the officers did not advise him of his rights pursuant to *Miranda*. He further contends his statements were involuntary, provided only in response to the coercive interrogation methods used by the detectives.

" 'Before being subjected to "custodial interrogation," a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." ' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1399-1400.) The advisement of *Miranda* rights is only required when a person is subject to a custodial interrogation. (*Id*. at p. 1400.) "Custodial interrogation has two components. First, it requires that the person being questioned be in custody." (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088.) "The second component of custodial interrogation is obviously interrogation. For *Miranda* purposes, interrogation is defined as any words or actions on the part of the police that the police should know are reasonably likely to elicit

---

[7]    On the trial court's own motion, the court dismissed the multiple-victim enhancement that alleged violations of section 289 against multiple victims (§ 667.61, subd. (e)(4)), pursuant to section 1118 and due process principles.

an incriminating response." (*Id.* at p. 1089.) Statements obtained in violation of a suspect's *Miranda* rights are not admissible as part of the prosecution's case-in-chief. (*People v. Neal* (2003) 31 Cal.4th 63, 90.)

Here, it is undisputed that at the time Hoehl voluntarily walked into the police station, he was a suspect: He knew R.H. claimed he molested her when he initiated the conversation with the detectives. It is also undisputed the ensuing conversation between Hoehl and the officers constituted an interrogation: The detectives asked questions they knew were reasonably likely to elicit an incriminating response. The trial court found, however, that there was no need to advise Hoehl of his *Miranda* rights because he was not in custody during the interrogation and that the statements were made voluntarily. Hoehl challenges those rulings.

"An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.] Whether a person is in custody is an objective test; the pertinent inquiry is whether there was ' " 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " ' " (*People v. Leonard, supra*, 40 Cal.4th at p. 1400.) "As the United States Supreme Court has instructed, 'the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation' "—that is, "whether a reasonable person in defendant's position would have felt he or she was in custody." (*People v. Stansbury* (1995) 9 Cal.4th 824, 830, quoting *Berkemer v. McCarty* (1984) 468 U.S. 420, 442.) "All the circumstances of the interrogation are relevant to this inquiry." (*People v. Moore* (2011) 51 Cal.4th 386, 395.)

California appellate courts have identified a number of factors to consider in the totality of the circumstances test. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162; accord, *People v. Torres* (2018) 25 Cal.App.5th 162, 172-173 (*Torres*); *People v. Saldana* (2018) 19 Cal.App.5th 432, 455 (*Saldana*).) This court has

11

considered the same list of factors. (*People v. Potter* (2021) 66 Cal.App.5th 528, 539-540.) These factors are: (1) whether the contact with law enforcement was initiated by the police, and if so, whether the person voluntarily agreed to an interview; (2) whether the express purpose of the interview was to question the person as a witness or a suspect; (3) where the interview took place; (4) whether police informed the person that he or she was under arrest or in custody; (5) whether the police informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; (6) whether there were restrictions on the person's freedom of movement during the interview; (7) how long the interrogation lasted; (8) how many police officers participated; (9) whether police dominated and controlled the course of the interrogation; (10) whether they manifested a belief that the person was culpable and they had evidence to prove it; (11) whether the police were aggressive, confrontational, and/or accusatory; (12) whether the police used interrogation techniques to pressure the suspect; (13) and whether the person was arrested at the end of the interrogation. (See *ibid.*, quoting *Aguilera*, at p. 1162.)

"Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. (*People v. Ochoa* [(1998)] 19 Cal.4th [353,] 401.) When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' (*id.* at p. 402) to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' (*ibid.*)." (*People v. Leonard, supra*, 40 Cal.4th at p. 1400.)

Here, the interview began with indications that the door to the interview room was unlocked, and Detective Brewer told Hoehl he was not under arrest and was free to end the conversation and leave at any time. Once Hoehl understood those

12

parameters, Detective Brewer gathered Hoehl's personal information. When Detective Brewer indicated he had a duty to investigate the "pretty specific allegations" against Hoehl, Hoehl replied, "I'm not gonna admit to anything like that." The conversation shifted to R.H.'s background. Hoehl provided suggestions as to why R.H. would make these allegations. Detective Brewer's questions gradually evolved to accusations. He asked Hoehl, "help me . . . understand how you didn't do this" and to explain how R.H. was "saying these things. Explain to me how in your mind you are not the guy to do this." Still, Detective Brewer allowed Hoehl to answer freely and control the conversation with several digressions from the topic. Hoehl again offered that R.H. might have made up the allegations after learning about "all kinds of stuff" on social media or because she has "Tourettes or something."

When Detective Kettle entered the room, the officers sat on the side of the room by the door, making it more awkward, if not difficult, to leave. The tenor of the conversation then shifted, and both detectives refused to accept Hoehl's denials of the allegations. One detective told Hoehl that he was very experienced with interviewing children and that "based on what he saw" of her interview, R.H. was "not making this stuff up." When Hoehl responded, "Well if she's talking about me, she is," the detective said, "No she's not." The detective then doubled down; "Like I said, I've done this a lot. And I can tell when kids are lying. And I can tell when they're telling the truth. And she's not makin' this up."

The detectives also confronted Hoehl with his admissions to his wife and repeatedly told him that he could either lie about it or tell the truth. When Hoehl continued denying the allegations, the detectives then offered Hoehl a way out. They told him that "we all make mistakes, right? That's why pencils have erasers" and advised Hoehl that he needed to "get out in front" of the allegations before it turned into something he could not control. The detectives continued, telling him it was not a question of *if* it happened, it was only a question of *why* it happened and that only

13

Hoehl could answer that question. The detectives offered their opinion that they could understand how physical affection within the family could turn into "this" and that Hoehl was a "good dad." They reiterated that everyone makes mistakes but being honest about them was what defined them as mistakes. The detectives told Hoehl that "ultimately what happened was not innocent" and that Hoehl was only "delaying the inevitable," because at some point Hoehl was going to have to acknowledge it happened and that he did it; the detectives were offering him a chance to tell the truth. In response to Hoehl's claim that R.H. would expose herself to him, the detectives said that they understood that "[i]t's a lot of temptation" and that Hoehl was "just a man just like the rest of us." Hoehl then admitted to several sexual acts with R.H.

The presence of several factors suggests the interview began as a noncustodial interrogation. Hoehl voluntarily came to the station and agreed to speak to the detectives. Although Hoehl knew he was a suspect, the detectives told him he was not under arrest, could leave at any time, and showed Hoehl that the door to the interview room was unlocked. The detectives patted him down at the beginning of the interview but allowed him to keep personal belongings such as his phone. During the interview, the two detectives wore plain clothes and never threatened Hoehl or raised their voices. The interview was conducted in a conversational tone and lasted about an hour and a half. But these factors do not preclude our conclusion that the interrogation became custodial as the interview continued.

In arriving at this conclusion, we find *Saldana, supra*, 19 Cal.App.5th 432 instructive. In that case, the interrogation began much like the interview in this case: The defendant arrived at the station on his own and voluntarily agreed to speak to a detective regarding allegations of sexual abuse, and he was advised at the start of the interview that he was not under arrest and was free to leave. (*Id*. at pp. 455-456.) The appellate court explained the latter advisement "indicates the beginning of the

14

interrogation was not custodial" and "a reasonable person would have felt free to walk right out the door." (*Id*. at p. 457.) However, shortly thereafter, "the detective asked an unrelenting number of accusatory questions," the defendant repeatedly denied the accusations, and the detective refused to "take no for an answer." (*Ibid*.) In the court's view, this "persistent, confrontational, and accusatory" (*id*. at p. 459) manner of questioning transformed the voluntary interview into a custodial interrogation. The court explained that the detective "did much more than simply confront Saldana with adverse evidence." (*Id*. at p. 459.) The detective also subjected the defendant to a two-pronged interrogation by using tactics that suggested the defendant should confess because no other course of action was plausible and that the defendant would "in some way feel better or benefit if he confesse[d], such as appealing to less morally culpable reasons for committing the offense." (*Id*. at p. 460.) According to the appellate court, the detective's insistence that the defendant was guilty and refusal to accept the defendant's denials, coupled with the "use of classic interrogation techniques reflects the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." (*Ibid*.) "[I]n light of the detective's repeated rejection of [the defendant's] denials, a reasonable person in [the defendant's] position eventually would have realized that telling the 'truth' meant admitting the detective's information was correct—and that until this 'truth' came out, the person could not leave." (*Id*. at p. 458.) The court noted that this was consistent with the defendant's testimony that he did not feel free to leave unless he confessed. (*Ibid*.)

*Torres, supra*, 25 Cal.App.5th 162, involved a similar scenario. In that case, the defendant voluntarily agreed to be interviewed regarding an accusation of sexual abuse. The interview took place in an unmarked police car in front of where the defendant lived. Before the interview, he was advised that he was not under arrest and was free to leave. (*Id*. at p. 167.) As in *Saldana*, the defendant's voluntary agreement to be interviewed and

15

the officer's advisement that he was free to leave weighed against a finding of custody. Also weighing against such a finding was the short duration of the interview, the " 'matter of fact' conversational tone" used during the interview, and the fact that the defendant was immediately arrested. (*Id*. at p. 174; see *id*. at pp. 173-174.) Nevertheless, the appellate court concluded the defendant was in custody due to the following: The defendant was interviewed as a suspect, the interview took place in "a location controlled by the detectives," and "the detectives dominated and controlled the course of the interrogation and used interrogation techniques to pressure [the defendant], including telling [him] about false evidence, asking confrontational and accusatory leading questions, giving [him] choices and encouraging him to pick one of those choices, . . . minimizing the accusations against him," and "express[ing] their belief that [he] was culpable and they had evidence to prove it." (*Id*. at p. 176.) After providing a detailed description of these interrogation techniques, the court explained, "the detectives went further than the detective in *Saldana*, essentially telling [the defendant] they would not leave, and [he] could not return home, until [he] stopped lying and confessed to what the detectives could prove scientifically." (*Id*. at p. 179.)

As in *Saldana* and *Torres*, Hoehl's voluntary interview transitioned into a custodial interrogation. The detectives in this case repeatedly rejected Hoehl's denials and confronted him with "unqualified assertions of his guilt" such that a reasonable person would have realized that telling the "truth" meant admitting to the allegations. (*Saldana, supra*, 19 Cal.App.5th at pp. 458-459; *Torres, supra*, 25 Cal.App.5th at p. 179.) And admitting to the allegations clearly had consequences. There is evidence that Hoehl himself understood this. More than once Hoehl stated that he was not going to say anything that was going to incriminate him. He also acknowledged that the rules would change if he did admit to the allegations by saying, "I don't want to throw my whole life away over some stupid thing like this" and "[s]ee, if I was to admit something like this, um, then this [showing the

16

detectives a photo of his children] is gone. And I love this more than anything in the world. So no."

The detectives rejected Hoehl's denials and repeatedly said they knew Hoehl abused R.H. because she was not lying and Mother told them Hoehl admitted to sexual activity with R.H. including oral copulation. The officers gave Hoehl the choice to continue to lie about it and call everyone else liars, or to "man[ ] up" and tell the truth. Indeed, even after Hoehl admitted several types of inappropriate conduct with R.H., the detectives continued to accuse Hoehl of not being fully honest until he admitted to having sex with her. Hoehl asked, "So I think you guys probably got enough right now, right?" The detective answered, "Well we just want the truth of everything that occurred. [¶] . . . [¶] . . . [S]ometimes it's really hard to admit other things have happened even though they have. [¶] . . . [¶] And I think that's the point we're at with the—the penetration—the intercourse." Despite Hoehl's denials, the detectives repeatedly told him he was not truly being honest until he admitted the penetration.

Hoehl was also subjected to tactics that suggested he should confess because no other course of action was plausible, similar to the defendants in *Saldana* and *Torres*. The detectives essentially advised Hoehl that if he continued to say that nothing happened, it would not go well for Hoehl. The detectives told Hoehl, "it's a done deal. So this is your opportunity to be . . . honest, to put your side of the story out, and explain why this happened." They also said that "ultimately what happened was not innocent," that Hoehl was only "delaying the inevitable" because at some point Hoehl was going to have to acknowledge it happened, and that he did it and the detectives were offering him a chance to tell the truth. One detective said that telling his side of the story, "shows that you're human, how you're not some monster that just has zero remorse." (Cf. *Saldana, supra*, 19 Cal.App.5th at p. 460 [detective conveyed the message that continued denials was futile]; *Torres, supra*,

17

25 Cal.App.5th at p. 177 [detectives claimed they would be able to prove that the defendant abused the victim and that the defendant needed to explain why his DNA was found on the girl's underwear].)

The detectives also told Hoehl, as in *Saldana* and *Torres*, that he would feel better or benefit in some way if he confessed. When Hoehl continued denying the allegations, the detectives told him that "we all make mistakes, right? That's why pencils have erasers" and advised Hoehl that he needed to "get out in front" of the allegations before it turned into something he could not control. According to the detectives, it was the act of being honest and truthful that defined whether actions constituted mistakes and that to meet Hoehl's goal of being a pillar of society, "part of that process is realizing that . . . we made mistakes." (Cf. *Torres, supra*, 25 Cal.App.5th at p. 177 [detective told the defendant that he was " 'an honest man [who] . . . just made a mistake' "]; *Saldana, supra*, 19 Cal.App.5th at p. 460.) And, as in *Torres*, the detectives employed tactics that appealed to less morally culpable reasons for committing the offense. They assured him that they could understand how physical affection within the family could turn into "this" and that Hoehl was a "good dad." They also told him that they understood the "temptation" from R.H. and that Hoehl was "just a man just like the rest of us." (Cf. *Torres, supra*, 25 Cal.App.5th at pp. 177, 179 [detectives minimized the offense by detailing worse crimes the detectives knew the defendant did not do and reassured the defendant that a man who accepts his mistakes can still be respected].)

The combination of the detectives' techniques conveyed a clear message that the interview would not end until Hoehl admitted the allegations and justified their insistence that Hoehl do so by offering that it would benefit Hoehl and/or render him less morally culpable. The detectives flatly rejected Hoehl's denials as lies and presented him with the choice of either continuing with his lies while calling others liars—with the strong implication that Hoehl's failure to explain *why* the abuse

happened made him look like a "monster"—or to be the man he wanted to be and admit he made a mistake in the face of understandable temptation. It was an unwinnable choice and one that a reasonable person would have understood they were not free to simply walk away from. We call that a custodial interrogation. As the court in *Saldana* stated: "[W]hen police create an atmosphere equivalent to that of formal arrest by questioning a suspect who is isolated behind closed doors in a police station interrogation room, by repeatedly confronting him with the evidence against him, repeatedly dismissing his denials, and telling him at the outset he is free to leave—when all the objective circumstances later are to the contrary—*Miranda* is triggered." (*Saldana, supra*, 19 Cal.App.5th at p. 438)

We recognize, as the court did in *Saldana*, "[t]hese tactics are not unusual, nor are they unreasonable. In fact, if [the defendant] had been properly *Mirandized* and made the same confession, it might be called good police work. But such an interrogation is associated with the 'full-blown interrogation of an arrestee, and except for a *Miranda* advisement, we cannot conceive how [the defendant's] interrogation might have differed had he been under arrest.' " (*Saldana, supra*, 19 Cal.App.5th at p. 460.) Nevertheless, because we conclude that Hoehl's videotaped statement was taken in violation of *Miranda*, it was inadmissible as part of the prosecution's case-in-chief, and we must now determine whether Hoehl was prejudiced by the admission of the statement.

"The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [citations]. That test requires the People . . . 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Elizalde* (2015) 61 Cal.4th 523, 542.) Another way to phrase the *Chapman* test is this: " 'Is it clear beyond a reasonable doubt that a rational

19

jury would have found the defendant guilty absent the error?' " (*People v. Merritt* (2017) 2 Cal.5th 819, 827.) Here, the answer is *yes*.

In arguing for a contrary conclusion, Hoehl contends that R.H. and S.H. had credibility issues, that S., I., and Anthony did not see any of the offenses committed, and that Anthony also initially lied to the investigating officers. He also contends that Mother had motive to lie because she wanted the house signed over to her. Hoehl argues, "Perhaps most telling is that the jury asked for both a transcript of Hoehl's police interview and a recording of Hoehl's trial testimony" and that the jury rendered a verdict less than a half an hour after they finished reviewing the evidence. According to him, his statement "had a forceful and finalizing impact on the jury." We are not persuaded.

R.H. provided detailed descriptions of the sexual abuse Hoehl inflicted upon her. Even if the jury questioned her credibility, other witnesses provided evidence that tended to corroborate her testimony. First, before Mother believed R.H.'s accusations, she relayed to the officers that Hoehl admitted to her that he touched R.H. inappropriately multiple times and that R.H. orally copulated him. And S.H. testified to the same pattern of abuse by Hoehl. Hoehl began touching her inappropriately when she was 12, he showed her pornography, touched her vagina multiple times, had her touch his penis, and hurt her by inserting a foreign object into her vagina. R.H., who was in the sixth grade when Hoehl began touching her inappropriately, testified to similar experiences. In short, the girls' testimony tended to corroborate each other.

Independent witnesses S. and I. both witnessed instances consistent with R.H.'s claims. S. saw Hoehl and R.H. whispering in R.H.'s bed while Hoehl rubbed her thigh. S. also walked in on Hoehl pulling down R.H.'s pants, as she laid on her back in Hoehl's bed. I. also testified that he saw instances of Hoehl tickling R.H. "around some of the private parts," including her "[v]agina," "[b]oobs," and "[b]utt." Anthony testified that when he visited, Hoehl and R.H. were always together. Anthony also "told [I.] that he saw [Hoehl] and [R.H.] on the bed with [R.H.] on her hands and knees on the bed and in

20

some weird position. And he was saying that they were starting to get naked." Mother also testified that Hoehl kissed R.H. and S.H. on the lips and refused to hold Mother's hand in favor of holding R.H.'s or S.H.'s hand instead. The accounts provided by others lent support for R.H.'s testimony. (Cf. *Torres, supra*, 25 Cal.App.5th at p. 181 [admission of the defendant's statement prejudicial in part where there were no other witnesses or physical evidence and the victim admitted she did not know the difference between the truth and a lie]; *Saldana, supra*, 19 Cal.App.5th at p. 463 [use of the defendant's confession was likely decisive because there were no independent witnesses, the victims were less than reliable, and expert testimony favored the defendant].)

Finally, pursuant to the jury instructions in this case, if the jury believed certain aspects of the testimony provided by S.H. or R.H., it could have considered that testimony for additional purposes. For example, pursuant to CALCRIM Nos. 375 and 1191A, if the People proved by a preponderance of the evidence that Hoehl showed R.H. and S.H. pornography and committed a lewd act with a dildo or back massager in violation of section 288, subdivision (a), the jury was permitted to consider this evidence in deciding whether Hoehl acted with the intent to commit the offenses alleged in this case or was likely to commit the sexual offenses charged. And, pursuant to CALCRIM No. 1191B, the jury was instructed that if it found beyond a reasonable doubt that Hoehl committed one or more of the crimes charged in counts 1 through 18, it was permitted to conclude from that evidence that he was likely to and did commit the other sex offenses charged.

Although Hoehl's videotaped statement did not include an admission that he inappropriately touched S.H., the jury found him guilty of two counts of lewd and lascivious acts against her. Thus, despite any credibility issues she had, the jury's verdicts reflect it believed S.H.'s claims of sexual abuse. Accordingly, the jury was permitted to consider S.H.'s testimony as part of the proof that Hoehl likely committed the offenses against R.H. Thus, the propensity evidence provided by S.H., in

21

combination with the testimony of R.H., her siblings, S. and I, her mother, and Anthony, constituted overwhelming evidence against Hoehl such that the erroneous admission of the videotaped statement was harmless beyond a reasonable doubt.

In light of these conclusions, we need not address Hoehl's argument that his statement was also involuntarily given.

## DISPOSITION

The judgment is affirmed.


        /s/
EARL, P. J.



We concur:



      /s/
HULL, J.



      /s/
MAURO, J.